**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x

| | |
|---|---|
| In re | : |
| | : Chapter 11 |
| EMPIRE FARMSTEAD BREWERY, INC., | : |
| | : Case No. 19- |
| Debtor. | : (Main Case) |
| | : (Joint Administration Requested) |
| | : |

------------------------------------------------------------------x

| | |
|---|---|
| In re | : |
| | : Chapter 11 |
| EMPIRE BREWING PROPERTIES, LLC, | : |
| | : Case No. 19- |
| Debtor. | : |
| | : |

------------------------------------------------------------------x

STATE OF NEW YORK        )
COUNTY OF ONONDAGA ) ss.:

### AFFIDAVIT OF DAVID KATLESKI IN SUPPORT OF
### CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

David Katleski, being duly sworn, deposes and says:

1.        I am the President and 100% owner of debtors Empire Farmstead Brewery, Inc.

("EFB") and Empire Brewing Properties, LLC ("EP") (EFB and EP, collectively "Debtors"). In my

capacity as President of the Debtors, I am familiar with all aspects of the Debtors' businesses and

operations. Except as otherwise indicated, all facts set forth in this Affidavit are based upon my

personal knowledge and knowledge of the Debtors' business operations and financial conditions, or

are based upon knowledge of employees of the Debtors reporting to me in the course of his/her

duties. If I were called upon to testify, I could and would testify to the facts set forth herein. I am

authorized on behalf of the Debtors to submit this Affidavit.

2.        To enable the Debtors to minimize the adverse effects of the commencement of these

chapter 11 cases on their businesses, the Debtors have requested various types of relief in their "first

day" motions, including a: (a) motion for joint administration; (b) motion to use cash collateral; (c) motion authorizing Debtors to pay prepetition wages and continuation of employee benefit programs; (d) motion prohibiting utility companies from discontinuing service; (e) motion authorizing the continuation of various insurance policies; (f) motion authorizing the Debtors to pay prepetition taxes and regulatory fees; (g) motion authorizing the continued use of existing cash management system; and (h) motion to implement notice procedures (individually a "First Day Motion", collectively, the "First Day Motions"[1]).

3.        The First Day Motions seek relief intended to allow the Debtors to effectively transition into chapter 11 and minimize disruption of the Debtors' business operations, thereby preserving and maximizing the value of the Debtors' estates.

4.        I submit this Affidavit in support of the chapter 11 petitions and First Day Motions filed by the Debtors on August 20, 2019 (the "Petition Date").  I am familiar with the contents of each First Day Motions (including the exhibits and/or schedules attached thereto) and I believe the relief sought in each First Day Motion: (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of productivity and value; (b) constitutes a critical element to achieving a successful sale of the Debtors' assets as a going concern; and (c) best serves the Debtors' estates and creditors' interests.

5.        Part I of this Affidavit will set forth a description of the Debtors' businesses and the circumstances surrounding the filing of their chapter 11 petitions.  Part II of this Affidavit will set forth the relevant facts in support of the First Day Motions filed by the Debtors contemporaneously herewith.

---

[1] All capitalized terms used but not defined herein shall have the same meaning ascribed to them in the relevant First Day Motions.

## PART I

6.    On the Petition Date, the Debtors filed with the United States Bankruptcy Court for the Northern District of New York (the "Bankruptcy Court") their voluntary petitions for relief under Chapter 11 of the Bankruptcy Code commencing the above-captioned Chapter 11 cases (the "Bankruptcy Cases").

7.    After the filing, the Debtors remained in possession of their assets and continued to manage and operate their businesses as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. Of note, only EFB has actual ongoing business operations and employees since EP is the holding company of the real property located at 33 Rippleton Road, Cazenovia, New York 13035 (the "Real Property").

8.    Debtors are currently seeking a court order to have EFB designated as the lead case, and be jointly administered with EP's bankruptcy case since the businesses are intertwined.

### A. Background of EFB

9.    EFB is a New York corporation with its principal office and place of business located at 33 Rippleton Road, Cazenovia, New York 13035. I am the sole owner of EFB.

10.    EFB was opened in June 2016 and is the largest farm brewery in New York State with a facility totaling more than 42,000 square feet on 22 acres (the "Brewery"). The Brewery consists of a tasting room/restaurant with 200 seats inside and an additional 200 seats on the outdoor patio. The tasting room serves alcohol, has a full bar, full service restaurant, is open for public use and has been utilized for numerous private parties for a variety of occasions.

11.    The Brewery has approximately 60 barrels of capacity at any point in time. The Brewery kegs, bottles and cans its craft beer for regional, national and international distribution.

3

12.    EFB has approximately 97 active employees ("Employees"). Of those Employees, 15 are salaried and 82 are hourly. The Employees at EFB are not unionized.

13.    In 2017 the Brewery generated approximately $2.71 million in revenue, and approximately $2.85 million in revenue for 2018.

14.    EFB leases the Real Property for its business operations from EP.

15.    The estimated weekly payroll for EFB over the next 30 days is approximately $26,230 plus payroll taxes of $9,446. Other than normal salary, it is not anticipated any officer, stockholder, or director of EFB will be paid in the 30 day period following the Petition Date.

**B. Background of EP**

16.    EP is a New York Limited Liability Company which holds title to the property located at 33 Rippleton Road, Cazenovia, New York 13035. I am the sole owner of EP.

17.    As referenced above, the Real Property consists of an approximate 42,000 square foot Brewery, with tasting room, and is situated on approximately 22 acres.

18.    EP simply holds title to the Real Property and has no employees. EP generates approximately $19,000 per month in revenue through rent payments made by EFB to lease the Real Property. EFB is no longer making rent payments.

19.    The weekly payroll for the next 30 days is zero, and there is no anticipated payments to any individual or member of EP.

**C. Pre-Petition Indebtedness with Community Bank, N.A.**

20.    The overwhelming majority of the Debtors' pre-petition indebtedness lies with secured creditor Community Bank, N.A. ("CBS"). As referenced in the Stipulation Allowing Use of Cash Collateral (the "Stipulation"), CBS holds a claim against the Debtors in the principal amount of $8,266,784.71, together with interest of $822,358.89 as of July 9, 2019 with a per diem of $1,347.98

4

thereafter and attorneys' fees and disbursements of $ 165,240.92 as of May 1, 2019 with additional

fees and disbursements continuing to date (the "CBS Claim"). The Debtors acknowledge and agree

they are jointly and severally liable to CBS for the amount of the CBS Claim. A description of how

the Debtors became indebted to CBS is below.

21.    CBS is the holder of certain promissory notes executed and delivered by the Debtors

described in and copies of which are attached as part of Schedule 1 to the Stipulation. In certain

cases, the Statewide Local Development Corporation ("Statewide") and the New York Job

Development Authority ("JDA") were also made parties to certain of the notes and collateral

documents, but pursuant to a participation agreement dated June 30, 2015 (a copy of which is also

attached as a part of Schedule 1 to the Stipulation), CBS was made a 100% participant in these

obligations pending the closing of the permanent financing in which case its interest would be

purchased by either Statewide or JDA. However, the permanent financing transaction never

happened due to the Debtors' failures to meet the requirements of Statewide and JDA, and as a result

CBS is the present 100% owner of all obligations of the Debtors referenced in Schedule 1 of the

Stipulation.

22.    As security for the obligations described in Schedule 1 of the Stipulation, including

but not limited to the unconditional guarantees of payment of each of the Debtors with respect to the

obligations owed by the other, CBS holds valid, perfected security interests in EFB's accounts

receivable, inventory, equipment, furniture, chattel paper, contracts, contract rights, chattel paper and

all proceeds by reason of a security agreement dated January 7, 2015, executed by EFB in favor of

Oneida Savings Bank, now CBS, and a further security agreement covering all personal property and

proceeds executed and delivered by EFB in favor of CBS dated February 13, 2017. Copies of the

security agreements are attached as part of Schedule 2 of the Stipulation.

23.    The security interests of CBS were perfected by the filing of UCC-1 financing statements in the New York Department of State on January 13, 2015 and June 24, 2016. Copies of these financing statements are also attached as part of Schedule 2 of the Stipulation.

24.    CBS also holds real property mortgages in its favor which encumber EP's fee interest in the Real Property and the buildings located thereon. The mortgages are described in and copies are attached as part of Schedule 3 of the Stipulation. Two of the mortgages also contained an assignment of leases and rents with respect to the mortgaged property, and there are two separate assignment of leases and rents for the two different mortgages which are also attached as part of Schedule 3 of the Stipulation.

25.    Additionally, CBS has a perfected security interest in the personal property assets of EP, formerly known as Chapman Properties, LLC, by reason of a security agreement dated January 7, 2015, executed and delivered by Chapman Properties, LLC, n/k/a EP in favor of Oneida Savings Bank, now CBS. Such security agreement granted CBS a security interest in accounts receivable, equipment, inventory, furniture, chattel paper, contracts, contract rights and general intangibles and in all proceeds of such collateral. The security interest was perfected by the filing of UCC-1 financing statements on January 1, 2015 and June 6, 2016, which were each amended on March 2, 2017 to reflect the name change from Chapman Properties, LLC to EP.

**D.   Circumstances Surrounding the Filing of these Bankruptcy Cases**

26.    As referenced above, EFB opened its doors in 2016.

27.    In the months leading up to the actual opening, EFB suffered a number of time delays and cost overruns in the building of the Brewery. The delays caused financial shortfalls from lack of revenue, and the cost overruns increased the secured debt substantially beyond original projections.

28.      Despite these setbacks, EFB was able to cover its secured debt obligations and its operational expenses.

29.      During the fourth quarter of 2016 through the second quarter of 2017, EFB suffered a wild yeast infection that caused the beer that was bottled to have a second fermentation. The second fermentation ultimately caused the beer to go sour. It took a substantial period of time to locate the source of the wild yeast infection and to stop it from reoccurring.

30.      During the months of correction caused by the wild yeast infection, all bottled beer had to be pulled back from distribution.

31.      The wild yeast infection, and its' aftermath: (a) added to the construction delays; (b) increased secured debt; and (c) caused financial dilemmas which have plagued the Debtors ever since.

32.      In 2017 the Debtors began working with and negotiating with its secured lender, CBS, to keep the Debtors alive, while the Debtors continually looked to actively sell or refinance the debt. The Debtors have continued in operation since that time.

33.      The Debtors, at CBS' suggestion, retained an investment banker. Debtors chose to retain Glendale Capital Partners who specialize in the marketing and sales of breweries.

**E.  Sale Efforts**

34.      Over the period of time consisting of eight (8) months between November 2017 and June 2018, and after having disbursed thousands of solicitations, the investment bankers were not able to procure one written purchase offer that was acceptable to the Debtors as well CBS.

35.      Thereafter, another local brewery expressed interest and negotiated with the Debtors and CBS, but was unable to produce a written purchase offer that was acceptable to the Debtors and CBS.

36.    Thereafter, a neighbor of the Debtors who had been utilizing the spent agricultural byproducts of the beer to feed a herd of cattle, expressed an interest in purchasing the Debtors' assets.

37.    That interest grew into negotiations over a long number of months, which have finally resulted in a purchase offer that was acceptable to the Debtors and CBS from Burnett Dairy Cooperative (the "Purchaser").

38.    On July 2, 2019, the Debtor and Purchaser entered into an Asset Purchase Agreement, pursuant to which Purchaser proposes to purchase substantially all assets comprising of the Brewery, including the tasting room, for $3.25 million.

39.    Shortly after the Petition Date, the Debtors will file a motion pursuant to section 363 of the Bankruptcy Code seeking, among other things, approval of bidding procedures, the appointment of the Purchaser as the stalking horse bidder for Debtors' assets, the date of an auction sale (if necessary), and, ultimately, approval of the successful bidder for the Debtors' assets.

40.    The purpose of the filing of the Debtors' Bankruptcy Cases, therefore, is to ensure the ongoing operations of the businesses so that they may be sold as going concerns, to market the Debtors' assets for sale as going concerns through a competitive bidding process, and to address the Debtors' financial difficulties for the benefit of their respective creditors.

## PART II

41.    As referenced above, below is a discussion regarding the various first day motions.

### A. Joint Administration Motion

42.    On the Petition Date, a *Motion of Debtors and Debtors in Possession for an Order Directing the Joint Administration of their Chapter 11 Cases* (the "Joint Administration Motion") was filed with the Bankruptcy Court.

43.     The Debtors seek entry of an Order granting the Joint Administration Motion, and directing, *inter alia*: (a) the joint administration of the Debtors' chapter 11 cases; and (b) parties in interest to use the Proposed Caption.

44.     The Debtors also seek authority to file the monthly operating reports required by the Operating Guidelines and Financial Reporting Requirements (together, the "Guidelines"), promulgated by the office of the United States Trustee for the Northern District of New York (the "U.S. Trustee") on a consolidated basis, if the Debtors determine, after consultation with the U.S. Trustee, that consolidated reports would further administrative economy and efficiency without prejudice to any party in interest and that such reports would accurately reflect the Debtors' consolidated business operations and financial affairs.  Nevertheless, the Debtors will maintain separate disbursement reports.

45.     The Debtors support the granting of the Joint Administration Motion because the joint administration of the Bankruptcy Cases will: (a) permit the Clerk of the Court to use a single docket for each of the Bankruptcy Cases; (b) combine notices to creditors; (c) save time and money by allowing permitting parties in interest to (i) use a single caption on all documents; and (ii) file documents in one case rather than in multiple ones; and (d) generally ease the administrative burden for the Bankruptcy Court and all parties in interest.

**B.  The Cash Collateral Motion**

46.     On the Petition Date, a *Motion of the Debtors for Entry of Interim and Final Orders: (I) Authorizing Debtors to Use Cash Collateral; (II) Determining Adequate Protection Pending Final Hearing; and (III) Scheduling Final Hearing* (the "Cash Collateral Motion") was filed in the Bankruptcy Court.

47.     As referenced above, CBS has agreed to allow the Debtors to use cash collateral as set forth in the Stipulation attached to the Cash Collateral Motion as Exhibit A.  The Debtors are seeking entry of an interim order allowing them to use Cash Collateral under the terms of the Stipulation.

48.     The Debtors are seeking the ability to use Cash Collateral for an interim period from the Petition Date until the final hearing date set by the Court, and if approved by the Court up to the Termination Date.  The use of the Cash Collateral is for the sole purpose of funding the expenses of operating the Debtors' business in the ordinary course in accordance with the Budget, which is attached to the Cash Collateral Motion as Exhibit B, and attached to the Stipulation as Schedule 5.

49.     In accordance with the Stipulation and Interim Order, the Debtors' actual expenditures on a weekly cumulative basis shall not exceed the projected expenditures set forth in the Budget by more than ten percent (10%) without the prior written consent of CBS.

50.     Debtors agree to provide CBS, on a weekly basis, with a written budget reconciliation report (the "Report") setting forth a comparison of the Debtors' actual receipts and disbursements to those originally projected in the Budget.  The Report shall be provided by the Debtors to CBS no later than the close of business on Wednesday of each week, covering the period of the prior week.

51.     In accordance with the provisions of Bankruptcy Code sections 361 and 363, and as a condition for the Debtors' use of Cash Collateral, CBS is entitled to adequate protection for and to the extent of any diminution in its prepetition collateral (the "Adequate Protection").  CBS shall be entitled to the following Adequate Protection:

> [a]llowed senior administrative expense claims (the "Superpriority Claims") with priority over any and all administrative expenses, adequate protection claims and all other claims against the Debtors, excluding for purposes hereof solely any unpaid statutory fees of the Office of the United States Trustee, now existing or hereafter arising, of any kind whatsoever, as provided under section 507(b) of the Bankruptcy Code,

including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under the Bankruptcy Code in the amount of the diminution. If any party in interest objects to the Stipulation and such objection is sustained, or if the Court does not approve this Stipulation, the [CBS] shall be fully protected to the extent of the Debtors' actual use of Cash Collateral in which the [CBS] has an interest prior to entry of an order of the Court curtailing or otherwise modifying the provisions of this Stipulation. The Superpriority Claims shall be payable from all property of the Debtors' estates; provided, however, that avoidance actions arising under Chapter 5 of the Bankruptcy Code, including any proceeds arising therefrom, shall be excluded from the reach of the Superpriority Claims. Anything herein to the contrary notwithstanding, nothing herein shall be construed as [CBS'] consent to the allowance and payment of any Chapter 7 trustee fees, or any professional fees or expenses of any person, or shall affect the rights of the [CBS] to object to the allowance and payment of such fees and expenses.

Effective as of the [P]etition [D]ate if this Stipulation is approved by the Court by a confirming order duly entered, without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, financing statements, mortgages or other instruments or documents, the grant in favor of [CBS] of replacement, valid, binding and enforceable, fully perfected liens on and security interest in all of the Debtors' assets (the "Adequate Protection Liens"), whether now owned or hereafter acquired, to the same extent, priority and enforceability held by [CBS] as of the [P]etition [D]ate, except as to avoidance actions arising under Chapter 5 of the Bankruptcy Code, including any proceeds arising therefrom.

52.    The Debtors further agree they have not granted, purported to grant and will not grant any other postpetition liens in assets of the Debtors' estates, except as may be provided by the Stipulation.

53.    The Debtors also agree to undertake all necessary actions to ensure that all proceeds of CBS' collateral are deposited in the Debtors' accounts maintained with CBS, consistent with the Debtors' existing cash management system and as otherwise required under CBS' prepetition loan documents described above.

11

54.    The Debtors submit that immediate and irreparable harm would result if the relief requested in the Cash Collateral Motion is not granted on an interim basis.  The Debtors have insufficient available sources of non-collateral working capital to carry on the operations of its businesses.  The ability of the Debtors to maintain business relationships with their agents, vendors and suppliers, pay necessary employees and agents, and otherwise finance their business operations is essential to the Debtors' continued viability.  In addition, the Debtors' critical need for Cash Collateral is immediate.  In the absence of the ability to use Cash Collateral, continued operation of the Debtors' businesses would be impossible, a precipitating liquidation would ensue, and immediate and irreparable harm to the Debtors' estates would occur.

**C.  The Wage Motion**

55.    On the Petition Date, the Debtors filed a *Motion for Entry of Interim and Final Orders: (I) Authorizing Debtors to Pay Prepetition Wages, Salaries and Benefits; (II) Authorizing the Continuation of Employee Benefit Programs in the Ordinary Course of Business; and (III) Directing Banks to Honor Prepetition Checks for Payment of Prepetition Wage, Salary and Benefit Obligations* (the "Wage Motion").

56.    To avoid the significant risks of resignations and of discontent or loss of morale among essential employees, and in view of the priority awarded to wage claims, it is necessary and appropriate that the Debtors be granted authorization requested in the Wage Motion.  The Debtors require the continued service of their Employees in order to ensure that the continuity and quality of their business operations will not be threatened, and so that the Debtors may continue, without unnecessary interruption, their efforts to achieve successful outcomes in these Bankruptcy Cases.

57.    As referenced above, EP simply holds title to the Brewery and did not have any active employees as of the Petition Date.

12

58.     As of the Petition Date, EFB employs approximately 97 people. Of those Employees, approximately 15 are salaried and approximately 82 are hourly. All of the Employees are non-union employees. The average weekly payroll for the Employees is approximately $26,230 plus payroll taxes of $9,446.

59.     As of the Petition Date, the accrued, unpaid payroll for the Employees is approximately $35,676, including EFB's portion of payroll taxes. The next scheduled pay date for the Employees is August 22, 2019, and it covers the pay period from August 12, 2019 to August 18, 2019.

60.     None of the Employees are currently owed amounts that are at, or over, the $12,850.00 cap on priority claim amounts set forth in section 507(a)(4) of the Bankruptcy Code.

61.     Accordingly, the Wage Motion seeks authority to pay accrued but unpaid prepetition wages and salaries due all Employees through the Petition Date.

62.     In addition, in the ordinary course of EFB's business, EFB provides benefits to its Employees through expense reimbursement, PTO, and certain Benefit Policies. The Benefit Policies include health insurance, dental insurance, vision insurance, and workers' compensation.

63.     Accordingly, the Debtors seek the authority, but not direction, to honor the expense reimbursement, PTO and Benefit Policies.

64.     The Debtors further request that this Court authorize CBS to process, honor and pay all prepetition checks issue by, and fund transfer requests made from, the Debtors with respect to Prepetition Wages and Benefits, whether presented before or after the Petition Date, provided that sufficient funds are on deposit in the applicable accounts to cover such payments.

65.     Finally, the Debtors routinely withhold from Employee paychecks amounts the Debtors are required to transmit to third parties, such as certain Garnishments and Withholding

Taxes. The Debtors' practice of directing such funds to the appropriate parties is in the ordinary course of business, and the Debtors are seeking authority to continue such practice.

66.    The relief requested in the Wage Motion will not prejudice creditors, but rather protect the Debtors' and Employees' respective interests and further allow the sale of the Debtors' assets as going concerns.

**D. The Utility Motion**

67.    On the Petition Date, the Debtors filed a *Motion for Entry of Interim and Final Orders: (I) Prohibiting Utility Companies from Altering, Refusing or Discontinuing Services To and/or Discriminating Against the Debtors; (II) Deeming Debtors' Utilities are Adequately Assured of Future Payment; and (III) Authorizing the Debtors to Pay Adequate Assurance Deposits* (the "Utility Motion").

68.    The Debtors currently use electricity, natural gas, phone, internet, water pollution control and other similar services provided by the Utility Companies identified on the Utility List. Uninterrupted service from the Utility Companies is essential to the Debtors' continued operation and successful restructuring. The Debtors could not maintain their facilities or continue to operate their business in the absence of continuous service. It is therefore critical that the Utility Companies continue to provide uninterrupted services to the Debtors. The Debtors intend to timely pay their postpetition obligations to the Utility Companies. The Debtors will make these payments with cash generated during these Bankruptcy Cases and pursuant to orders of this Court authorizing the use of cash collateral.

69.    Although the Debtors maintain that their ability to generate cash from their operations during these Bankruptcy Cases, or through the use of cash collateral, should be sufficient assurance of postpetition payments to the Utility Companies, the Debtors propose to provide a deposit equal to

14

one month of utility service, calculated on the basis of the historical average of the Debtors' actual usage over the past twelve (12) months (the "Adequate Assurance Deposit"), to any Utility Company who requests such a deposit in writing, provided that such requesting Utility Company does not already hold a deposit equal to or greater than the Adequate Assurance Deposit, and provided further that such Utility Company is not currently paid in advance for its services.

70.     The Debtors submit that the Adequate Assurance Deposit, if timely requested by a Utility Company, in conjunction with the Debtors' ability to pay for future utility service in the ordinary course of business (collectively, the "Proposed Adequate Assurance"), constitutes sufficient adequate assurance of future payment to the Utility Companies to satisfy the requirements of section 366 of the Bankruptcy Code. Accordingly, the Debtors request that, absent the filing of an Objection, each Utility Company shall be deemed to have: (a) stipulated that the Proposed Adequate Assurance constitutes adequate assurance of payment to such Utility Company within the meaning of section 366 of the Bankruptcy Code; and (b) waived any right to seek additional or different adequate assurance during the course of these Bankruptcy Cases.

71.     The Debtors acknowledge, despite their best efforts, certain Utility Companies may not be included on the Utility List, and further request in the Utility Motion that any Order be binding on all Utility Companies regardless of when any given Utility Company was added to the Utility List and that all Utility Companies, including subsequently added Utility Companies, be prohibited from altering, refusing, or discontinuing utility services to the Debtors absent further order of the Court.

72.     Receiving the relief requested herein is essential for the Debtors to be able to carry out their sale efforts. If the Motion is not granted, the Debtors could be forced to address numerous requests by their Utility Companies in a disorganized manner at a critical point in these Bankruptcy

Cases. Moreover, the Debtors could be blindsided by a Utility Company unilaterally deciding, on or after the thirtieth day following the Petition Date, it is not adequately protected and therefore will discontinue service or make an exorbitant demand for payment to continue service. Discontinuation of utility service, particularly gas and electricity, could essentially shut down the Debtors' operations, thereby jeopardizing the Debtors' sale efforts.

73.     Based on the foregoing, the Debtors respectfully submit that granting the relief requested in the Utility Motion is both necessary and appropriate.

**E. The Insurance Motion**

74.     On the Petition Date, the Debtors filed a *Motion for Entry of Interim and Final Orders: (I) Authorizing Continuation of Various Insurance Policies; and (II) Authorizing Payment of Prepetition and Postpetition Obligations in Respect Thereof* (the "Insurance Motion").

75.     Prior to the Petition Date, and in connection with the daily operation of their businesses, the Debtors maintained an insurance policy, which provided the Debtors' employees with workers' compensation benefits required by applicable law (the "Workers' Compensation Insurance"). The Workers' Compensation Insurance is provided by Agri-Services Agency. The Workers' Compensation Insurance premiums total $19,916.28 annually and are paid monthly. The current policy is effective for the period of January 1, 2019 through January 1, 2020.

76.     As of the Petition Date, the Debtors are current with respect to the Workers' Compensation Insurance premiums due.

77.     Prior to the Petition Date, in connection with the daily operation of the businesses, the Debtors maintained general liability insurance (the "Liability Insurance") with Erie Insurance Company. The Liability Insurance premiums total $25,092.96 annually and are paid monthly. The current policy is effective for the period of April 1, 2019 through April 1, 2020.

78.    As of the Petition Date, the Debtors are current with respect to the monthly Liability Insurance premiums due.

79.    Prior to the Petition, in conjunction with the daily operations of the businesses, the Debtor maintained commercial auto insurance (the "Auto Insurance") with Erie Insurance Company. The Auto Insurance premiums total $2,508 annually.  The current policy is effective for the period of April 1, 2019 through April 1, 2020.

80.    As of the Petition Date, the Debtors are current with respect to the Auto Insurance premiums due.

81.    By the Insurance Motion, the Debtors seek an order authorizing, but not directing, the Debtors to pay, in the ordinary course of business, the premiums due under the Insurance Policies. Such relief is justified because the failure to pay any such amounts might result in a lapse in the coverage provided by the respective insurance companies, which lapse could be detrimental to the Debtors' on-going operations and reorganization plans.

82.    It is essential to the continued operation of the Debtors' businesses and the Debtors' efforts to sell that the services of their employees be retained, that the morale of such persons be maintained, and that the Debtors' estates not be exposed to unnecessary and unwarranted risks. If the Debtors are not permitted to maintain the Insurance Policies on an ongoing and uninterrupted basis, both the Debtors and their employees may incur severe economic hardship.

83.    The risk that eligible claimants will not receive payments with respect to employment-related injuries or professional liability claims will have a devastating effect on the financial well-being and morale of the employees and their willingness to remain in the Debtors' employ, further resulting in a severe disruption of the Debtors' business to the detriment of all parties in interest. A significant deterioration in employee morale at this critical time undoubtedly

17

will have a substantial adverse impact on the Debtors and their employees, the value of their assets and businesses and their ability to reorganize. In addition, should the Debtors be constrained to operate with inadequate liability insurance, the Debtors' estates will be exposed to potentially devastating liability for incidents currently covered by the Insurance Policies.

84.     In addition, applicable state law mandates that the Debtors provide their employees with workers' compensation insurance coverage and maintain automobile insurance with respect to the various vehicles operated by the Debtors in the ordinary course of business. The Debtors have disclosed that, as of the Petition Date, there are no unpaid insurance premiums due.

85.     The Debtors submit that any amount to be paid in respect of prepetition premiums would be *de minimus* compared with the size of the Debtors' estates, the potential liability exposure of the Debtors' estates, the potential liability exposure of the Debtors absent adequate insurance coverage and the importance of employees to the entire rehabilitation effort. Under the circumstances of these Bankruptcy Cases, the maintenance of the Insurance Policies is more than justified, and in the case of the workers' compensation insurance, automobile insurance and liability insurance, is mandated by applicable law.

86.     The granting of the relief requested in the Insurance Motion is essential to preserve the Debtors' estates and it is respectfully requested the Bankruptcy Court grant the same.

**F.   The Taxes and Fees Motion**

87.     On the Petition Date, a *Motion for Entry of Interim and Final Orders Authorizing the Debtors to Pay Prepetition Taxes and Regulatory Fees* (the "Taxes and Regulatory Fees Motion") was filed with the Bankruptcy Court.

88.     Pursuant to the Taxes and Regulatory Fees Motion, the Debtors seek, *inter alia*, authority to pay, in their sole discretion, in the ordinary course of their business and on their normal

due dates, all undisputed prepetition Taxes and Fees owed to the Taxing Authorities, including all Taxes and Fees subsequently determined upon audit to be owed for periods prior to the Petition Date.

89.     The Debtors further request that all applicable bank and financial institutions be authorized and directed, when requested by the Debtors in their sole discretion, to receive, process, honor and pay any and all checks or electronic transfers drawn on the Debtors' accounts, to pay all prepetition Taxes and Fees owed to the Taxing Authorities, whether those checks were presented prior to or after the Petition Date, and to make those transfers provided that sufficient funds are available in the applicable accounts to make such payments. To the extent the Taxing Authorities have not otherwise received payment for all prepetition Taxes and Fees owed, the Debtors seek authorization to issue replacement checks, or to provide for other means of payment to the Taxing Authorities, to the extent necessary, to pay all outstanding Taxes and Fees owing for periods prior to the Petition Date.

90.     In the ordinary course of their business, the Debtors are required to collect and/or pay Taxes and Fees. The Debtors must remit these Taxes and Fees to the various governmental entities of the jurisdictions in which the Debtors conduct business. The process by which the Debtors remit the Taxes and Fees varies, depending on the nature of the liability at issue and the Taxing Authority to which the relevant payment is made.

91.     As of the Petition Date, the Debtors believe they are generally current with respect to the payments of Taxes except for taxes owed to: (a) the Alcohol and Tobacco Tax and Trade Bureau for the total sum of $19,705; (b) the NYS Commissioner of Taxation and Finance for the MT-50 Alcoholic Beverage Tax for the total sum of $34,639; and (c) certain Taxes which may have accrued prepetition but yet to become due for payment.

92.     The Debtors pay the Taxes and Fees to the Taxing Authorities on a periodic basis with funds drawn by checks or by means of electronic fund transfers whether sent directly to the Taxing Authorities or sent to a third-party administrator who pays the appropriate Taxing Authorities. Prior to the Petition Date, Taxing Authorities were sent checks or electronic transfers in respect of such obligations that may not have cleared the Debtors' banks or other financial institutions as of the Petition Date.

93.     As a result, it is imperative the relief requested in the Taxes and Regulatory Fees Motion is granted. The payment of certain of the prepetition Taxes and Fees at this time would not prejudice the rights of other creditors, but merely would accelerate payments that otherwise would become due in connection with the Debtors' sale. At the same time, payment likely would avoid conflict and administrative problems arising from actions the Taxing Authorities would take against the Debtors to collect due and owing Taxes and Fees.

94.     Any delay in paying the obligations relating to the Taxes and Fees would be detrimental to the Debtors, their creditors and their estates. Indeed, the Debtors' ability to manage and run their business operations with as little disruption as possible requires, in part, that they remain in good standing with the relevant Taxing Authorities. For the foregoing reasons, the Debtors submit that the relief requested herein is necessary and appropriate, and is in the best interests of the Debtors' estates, their creditors and other parties in interest.

### G. The Bank Account Motion

95.     A list of the Debtors' Bank Accounts is provided in the *Motion for Interim and Final Orders Authorizing: (I) Continued Maintenance of Existing Bank Accounts; (II) Continued Use of Existing Cash Management System; and (III) Continued Use of Existing Business Forms* (the "Bank Account Motion"). All of the Bank Accounts are located at CBS.

96.     To efficiently and seamlessly manages their businesses, the Debtors use a cash management system (the "Cash Management System") to collect and transfer the funds generated by the Debtors' operations and to disburse funds needed to satisfy the Debtors' financial obligations. As referenced above, the Debtors' Cash Management System consists of the Bank Accounts. With this system in place, the Debtors are able to accurately record collections, transfers, and disbursements as they are made through the various Bank Accounts. The Cash Management System both collects funds and fund operations and administrative costs, primarily consisting of payments to vendors, supplies, contractors and employees.

97.     Receipts from the Debtors' operations will be collected and deposited into the Bank Accounts.

98.     The Debtors will each maintain general disbursements accounts for payments made to vendors, suppliers and contractors.  In addition, the Debtors will maintain one or more specialized disbursement account(s) for employee related expenses, including payroll, payroll withholding and employee benefits payments.

99.     Pursuant to standard chapter 11 operating practice in this jurisdiction, the Debtors are required, among other things, to open new bank accounts upon the filing of the bankruptcy petitions, and are further required to designate such accounts as "Debtor in Possession" on the respective account signature cards.  The Debtors are requesting the Court enter an Order: (a) authorizing the continuance maintenance of existing Bank Accounts; (b) authorizing the continued use of existing Cash Management System; and (c) authorizing the continued use of existing business forms.

100.    The Debtors submit that retention of the current Cash Management System is in the best interests of the estates.  Requiring the Debtors to adopt a new, segmented cash management

system at this early and critical stage of these Bankruptcy Cases would be expensive, create unnecessary administrative problems, and would be much more disruptive than productive.

101.    The Cash Management System allows the Debtors to centrally manage all cash flow needs and includes the necessary accounting controls to enable the Debtors, as well as other interested parties in this case, to trace funds through the Cash Management System, and ensure that all transactions are adequately documented and readily ascertainable.  The Debtors will continue to maintain detailed records reflecting all transfers of funds.

102.    In furtherance of this goal, the Debtors request that the Bank at which their Bank Accounts are maintained be authorized and directed to continue to administer those Bank Accounts as they were maintained prepetition, without interruption and in the usual and ordinary course, and to pay and honor all checks, drafts or wires issued on the Bank Accounts on account of any claims arising on or after the Petition Date so long as sufficient funds are in said Bank Accounts.

103.    Ultimately, without the requested relief, the Debtors would be unable to effectively and efficiently maintain their operations, which would cause significant harm to the Debtors, their estates and their creditors.

104.    The Debtors also request permission to use their existing Business Forms.  If the Debtors are not permitted to maintain and utilize their existing Business Forms the resulting prejudice will include:  (i) disruption of the ordinary financial affairs and business operations of the Debtors and non-debtor affiliated entities; (ii) delay in the administration of the Debtors' estates, and (iii) significant cost to the estate to set up new systems and open new accounts and to print new business forms.

105.    Based on the foregoing, the Debtors submit that sufficient cause exists to allow the Debtors to maintain their Bank Accounts, Cash Management System and Business Forms, and

respectfully request they be authorized to continue using their current Cash Management System and Business Forms during the postpetition period.

**H.  The Notice Procedures Motion**

106.    On the Petition Date, a *Motion to Implement Certain Notice Procedures* (the "Notice Procedures Motion") was filed by the Debtors.

107.    As referenced in the Notice Procedures Motion, the Debtors combined have approximately 29 creditors holding unsecured claims totaling approximately $1,158,430.  The Debtors also have approximately seven (7) secured creditors, and approximately two (2) creditors holding priority claims.

108.    In an effort to avoid the administrative costs associated with large mailings, and thereby preserve funds for the estate, the Debtors propose to limit notice of the Pleadings filed in these cases to be served on the Master Service List.  Pursuant to section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9007, the Debtors request that the Court approve the notice procedures outlined in the Notice Procedures Motion.

109.    The Debtors seek to provide notice of all Pleadings to the Master Service List which shall consist of the following entities:

        a)   the Debtors;

        b)   the Debtors' Counsel;

        c)   the Office of United States Trustee for the Northern District of New York;

        d)   attorneys for Community Bank, N.A.;

        e)   the attorney(s) for any committee formed pursuant to Section 1102 of the Bankruptcy Code;

        f)   The 20 largest unsecured creditors of the Debtors' combined cases; and

        g)   The Securities and Exchange Commission, the Internal Revenue Service, the New York State Office of the Attorney General, and other governmental agencies

to the extent required by the Bankruptcy Rules and the Local Bankruptcy Rules for the Northern District of New York; and

h)  All parties requesting notice in these cases.

110.    The Procedures further discussed in the Motion allow any other party in interest to file a Request to be included on the Master Service List.

111.    In addition, the Notice Procedures Motion acknowledges notice of the following pleadings and deadlines on all parties in interest must be provided under the following circumstances:

(a)    The time fixed for filing proofs of claim pursuant to Bankruptcy Rule 3003(c);

(b)    The time fixed for filing objections to, and the hearing to consider approval of, a disclosure statement;

(c)    The hearing to consider confirmation of a chapter 11 plan; and

(d)    Notice for approval of the sale of all or substantially all of the Debtors' assets.

112.    The Debtors submit the relief requested in the Notice Procedures Motion is in the best interests of the estate and respectfully submit the Notice Procedures Motion should be granted in its entirety.

*[Signature Page Follows]*

I swear, under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct to the best of my knowledge, information and belief.

_____

David Katleski

Sworn to before me this 20th
day of August, 2019

_____
Notary Public

KATHARINE H. FAHEY
Notary Public, State of New York
Qual. in Onondaga Co. No. 01FA6128504
Commission Expires June 13, 2021