**SO ORDERED.**

**Date:** 10/31/19

**HON. DIANE DAVIS**
**UNITED STATES BANKRUPTCY JUDGE**

2019 OCT 31  PM 1:49

CLERK OF THE
BANKRUPTCY COURT
N.D. OF NY
UTICA

FILE

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x

In re                                                          :
                                                               : Chapter 11
EMPIRE FARMSTEAD BREWERY, INC.,
                                                               : Case No. 19-61188
                    Debtor.                                     : Main Case
                                                               : Jointly Administered
                                                               :
------------------------------------------------------------------x

In re                                                          :
                                                               : Chapter 11
EMPIRE BREWING PROPERTIES, LLC,                                :
                                                               : Case No. 19-61189
                    Debtor.                                     :
                                                               :
------------------------------------------------------------------x

### ORDER APPROVING SALE OF DEBTORS' ASSETS

Upon reading and filing of the motion by the Debtors Empire Farmstead Brewery, Inc.

("EFB") and Empire Brewing Properties, LLC ("EP") (collectively, the "Debtors"), by and through

their counsel, Harris Beach PLLC, seeking an Order: (i) authorizing and approving the sale of substantially all of the Debtors' Assets pursuant to 11 U.S.C. §§363(b)(1) and (f), free and clear of all liens, claims and encumbrances, with the lien, claim and encumbrance of Community Bank, N.A. ("CBS") to attach to the proceeds of the sale defined in the Purchase Agreement, outside the ordinary course of business; and (ii) approving the proposed assumption and assignment or rejection of certain executory contracts and unexpired lease agreements pursuant to 11 U.S.C. §365 (the "Sale Motion") [Dkt. No. 46]; and the Court having: (i) reviewed the Sale Motion and all supporting documents; (ii) previously entered the *Order Approving Debtors Possession's Motion Pursuant to Sections 105 and 363 of the Bankruptcy Code and Bankruptcy Rule 6004: (A) Approving the Bidding Procedures and Other Related Relief; (B)(i) Authorizing the Sale of Certain of Debtors' Assets Free and Clear of All Liens, Claims, Interests and Encumbrances, Subject to the Terms of the Asset Purchase Agreement and Subject to Higher and/or Better Offers; (ii) Authorizing and Approving a Certain Asset Purchase Agreement with Burnett Dairy Cooperative; and (iii) Authorizing the Debtors to Consummate All Transactions Related to the Proposed Sale; (C) Approving the Form and Manner of Notice of the Sale; and (D) Authorizing Debtors to Assume Certain Unexpired Leases and Executory Contracts and Assign Such Leases and Executory Contracts to Purchaser Pursuant to 11 U.S.C. §§ 365(a), (b) and (c) and Bankruptcy Rule 6006(e)(1)* (the "Bidding Procedures Order") [Dkt. No. 84], which, among other things, approved bidding procedures (the "Bidding Procedures") for the sale of the Debtors' Assets (the "Asset Sale"); (iii) conducted a hearing on October 23, 2019 to consider granting the relief requested in the Sale Motion (the "Sale Hearing"); and the Debtors having conducted an auction on October 21, 2019 (the "Auction") in an appropriate and efficient manner in accordance with the Bidding Procedures and having determined

2

in their business judgment, in consultation with Community Bank, N.A. ("CBS"), that the bid (the "Prevailing Bid") received from Rocale, LLC and Feldmeier Equipment, Inc., solely as guarantor of the performance of Rocale, LLC ("Rocale" or the "Purchaser"), under the Agreement of Purchase and Sale of Assets in substantially the form attached hereto as **Exhibit "A"** (the "Rocale APA"), is the highest and best offer for the assets that are the subject of the Rocale APA (the "Assets"), and will maximize value of the Debtors' estates; and upon reading the Certificate of Service with respect to the Sale Motion; and the Debtors having provided sufficient notice of the proposed Asset Sale to (i) the Office of the United States Trustee for the Northern District of New York, (ii) counsel for CBS, (iii) all creditors or their counsel either listed in the Debtors' bankruptcy schedules or that have filed claims, (iv) all appropriate federal, state and local taxing authorities, (v) all appropriate federal, state and local non-taxing authorities, and (vi) all parties having filed a notice of appearance in the Debtors' Chapter 11 cases pursuant to Bankruptcy Rule 2002, in accordance with the Federal Rules of Bankruptcy Procedure (collectively, the "Notice Parties"), and due proof of service thereof having been filed with this Court; and upon reading the Notice of Auction Results [Dkt. No. 97], and Certificate of Services with respect to the Notice of Auction Results, and the Debtors by Harris Beach PLLC, having appeared in support of the Sale Motion at the Sale Hearing; and appearances having been entered on behalf of (i) the Office of the United States Trustee by Erin P. Champion, Esq.; (ii) CBS by Barclay Damon; (iii) the Purchaser by Barclay Damon and (iii) Burnett Dairy Cooperative ("Burnett Dairy"), by Bond Schoeneck & King at the Sale Hearing; and all objections, if any, to the relief requested having been withdrawn or otherwise resolved; this Court makes the following:

3

## FINDINGS OF FACT and CONCLUSIONS OF LAW:

A.    Sufficient cause exists to warrant the Asset Sale, which consists of substantially all of the Debtors' business assets as set out in the Rocale APA.[1]

B.    The Debtors may sell the Assets free and clear of all liens, claims and encumbrances because, in each case, one or more of the standards set forth in 11 U.S.C. §§ 363(f)(1)-(5) has been satisfied.

C.    The Asset Sale appears to be in the best interest of the Debtors, their estates and their creditors.

D.    The Asset Sale is a reasonable exercise of the Debtors' business judgment.

E.    As evidenced by the Certificates of Service previously filed with this Court, proper, timely, adequate and sufficient notice of the Sale Motion, has been provided in accordance with 11 U.S.C. §§ 102(1), 363, and 365 and no other or further notice of the Sale Motion, or of the entry of this Order is required.

F.    Proper, timely, adequate and sufficient notice of the Asset Sale was provided to all creditors asserting a security interest, lien, encumbrance or other interest against all or any portion of the Assets, including the: (i) the Office of the United States Trustee for the Northern District of New York, (ii) all Lessors and counter-parties under the Leases and Executory Contract; (iii) all creditors of the Debtors; (iv) entities known by the Debtors to have filed a Notice of Appearance or a request for receipt of Chapter 11 Notices and Pleadings filed in the Debtors' cases as of the date of the Sale Motion; (v) all parties (and their counsel if known) which hold liens on or security interests in the

---

[1]    Capitalized terms not otherwise defined herein shall have the same meaning ascribed in the Rocale APA.

4

Assets in connection with the Sale Motion; and (vi) such additional parties as and entities as deemed appropriate by the Debtors.

G.      The terms of the Rocale APA are substantially similar to the terms of the Agreement of Purchase and Sale of Assets entered into between Burnett Dairy and the Debtors on July 2, 2019 (the "Burnett APA").

H.      The Debtors have demonstrated that approval of the Rocale APA and consummation of the sale at this time is in the best interests of the Debtors, the estates and creditors.  The Debtors have advanced good and sufficient business justification supporting the Asset Sale to the Purchaser pursuant to § 363(b) of the Bankruptcy Code, as set forth in the Sale Motion, and it is a reasonable exercise of business judgment to consummate the Asset Sale on the terms and conditions set forth in the Rocale APA, and to execute, deliver and perform its obligations thereunder.  Sound business judgment includes, but is not limited to, the fact that (i) there is a risk of immediate and irreparable loss of value of the Assets if the Asset Sale is not consummated, and (ii) the consummation of the transaction contemplated under the Rocale APA presents the best opportunity to realize the value of the Assets to avoid further decline or devaluation thereof.

I.      Notice of the Asset Sale has been properly and sufficiently given to provide the opportunity to maximize the value for the Assets.

J.      The Debtors have full corporate power and authority to execute and deliver the Rocale APA, and documents contemplated thereby, and to perform the transactions contemplated thereby; no consents or approvals, other than those expressly provided for in the Rocale APA and herein, are required for the Debtors to consummate the Asset Sale.

5

K.      The consideration to be paid by the Purchaser under the Rocale APA constitutes adequate and fair value for the Assets, and the terms and conditions of the Rocale APA are fair and reasonable under the Bankruptcy Code and under the laws of the United States, any state, territory or possession of the United States of the District of Columbia.

L.      The Debtors have good title to the Assets, and accordingly the transfer of such Assets, to the Purchaser pursuant to the Rocale APA will be a legal, valid and effective transfer of the Assets.

M.      The Rocale APA was negotiated, proposed and entered into in good faith, from arm's-length bargaining positions by the Debtors and the Purchaser Buyer and constitutes the highest or otherwise best offer for the Assets received by the Debtors after: (1) an extended period in which third parties had an opportunity to seek information and enter into discussions or negotiations with the Debtors and their retained advisors concerning the Asset Sale; and (2) the Auction held on October 21, 2019.

N.      The Purchaser is a good faith purchaser entitled to the protections afforded by 11 U.S.C. § 363(m) of the Bankruptcy Code with respect to the transactions approved hereby.

O.      The Purchaser would not have entered into the Rocale APA to purchase the Assets, and will not consummate the transactions contemplated thereby, thus adversely affecting the Debtors, their estates and their creditors, if the Asset Sale to the Purchaser was not free and clear of all liens, claims, encumbrances and interests of any kind or nature whatsoever, or if the Purchaser would, or in the future could, be liable for any of the liens, claims, encumbrances or interests, including the liens asserted by CBS.

6

P.    As of the Petition Date, the Debtors were indebted to CBS in excess of $9,200,000.00 ("Prepetition Senior Debt") pursuant to a series of secured notes, security agreements and a note and mortgage.

Q.    The Prepetition Senior Debt is (i) legal, valid, binding, and enforceable against each Debtor; and (ii) not subject to any contest, objection, recoupment, defense, counterclaim, offset, claim of subordination, claim of re-characterization, claim of avoidance of any nature, attack or challenge under the Bankruptcy Code, other applicable non-bankruptcy law, or otherwise.

R.    The Prepetition Senior Debt is secured by (i) Prepetition Security Agreements executed by the Debtors in favor of CBS covering all personal property of the Debtor dated January 7, 2015, perfected January 13, 2015 and June 24, 2016, and amended on March 2, 2017; and (ii) mortgages covering the real property owned by EP (the "Collateral") granted to CBS dated June 30, 2015, and September 19, 2016. Such liens on the Collateral shall be referred to as the "CBS Liens".

S.    The CBS Liens are legal, valid, enforceable, non-avoidable, and duly perfected security interests in and liens upon the Collateral and there are no other liens or security interests having priority over the CBS Liens except for those relating to the Cazenovia Restaurant equipment which will be paid in full and who have been noticed in, and have consented to, the Asset Sale. The Liens in the Collateral were granted to CBS for fair consideration and reasonably equivalent value, and were granted contemporaneously with the making of the loans secured thereby.

T.    The Asset Sale is subject to the consent of CBS which has been obtained as stated on the record.

U.    No other or further notice of the Asset Sale is necessary.

7

**BASED UPON THE FOREGOING FINDINGS OF FACT AND CONCLUSIONS OF LAW,
IT IS HEREBY ORDERED THAT:**

1.      The Recitals set forth above are hereby incorporated herein by reference in their entirety. The Sale Motion is granted to the extent provided herein, and the bid by Rocale is hereby approved.

2.      Any objections to the Motion or the relief requested therein that have not been withdrawn, waived or settled, and all reservations of rights included therein, are overruled on the merits.

3.      The Debtors are hereby authorized to sell the Assets to the Purchaser for the sum of Three Million Four Hundred Forty Thousand Dollars (US) ($3,440,000.00) which shall be paid immediately upon Closing by the Purchaser, in accordance with the terms of the written Rocale APA. All sales tax, recording tax, transfer tax, stamp tax or similar taxes associated with the Asset Sale shall be paid in accordance with Section 2.01 of the Rocale APA. The division of the proceeds of Asset Sale shall be: (a)$2,997,500.00 to CBS; (b) $200,000.00 to the balance of secured lenders as negotiated; (c) $112,500.00 as a "Break-Up Fee" and $50,000.00 in expenses to Burnett Dairy Cooperative ("Burnett Dairy") as set forth in the Bidding Procedures Order, with all of the proceeds referenced in 3(a),(b) and (c) to be paid at Closing; and $80,000.00 to fund a pool for the administrative and unsecured creditors, which will be held in escrow by Debtors' counsel.

4.      Burnett Diary is hereby deemed the next highest bidder (the "Next Highest Bidder"), and its bid as set forth in the Burnett APA is deemed to be the Next Highest Bid[2] in accordance with, and pursuant to, the Bidding Procedures and the Bidding Procedures Order.

5.      In the event that the Rocale APA is terminated by either the Debtors or Purchaser in accordance with the terms set forth in the Rocale APA, then (a) the Debtors shall be authorized to sell the Assets to Burnett Dairy as the Next Highest Bidder pursuant to the terms of the Burnett APA as modified by paragraph 3 of the Bidding Procedures Order; (b) all references in this Sale Order to the Rocale APA and to the Purchaser shall automatically be deemed to refer instead to the Burnett APA and Burnett Dairy respectively; (c) paragraph 3 hereof shall be deemed modified to reflect that the purchase price to be paid by Burnett for the Assets shall be Three Million Two Hundred Fifty-Two Thousand Five Hundred Dollars ($3,252,500) which shall be allocated (x) $2,997,500 to CBS, (y) $200,000 to the balance of secured creditors and (z) $55,000 to fund a pool for the administrative and unsecured creditors; and (d) Burnett Dairy may seek a further order of the Court confirming the foregoing, provided, however, that entry of such an order shall not be a precondition to the consummation of a sale of the Assets to Burnett Dairy.  For avoidance of doubt, nothing in this Sale Order shall be deemed to override or modify the Bidding Procedures Order and the Bidding Procedures previously approved by the Court, each of which shall remain in full force and effect in accordance with their respective terms.

6.      The Assets sold to the Purchaser shall be free and clear of all liens, claims and encumbrances, and such Assets shall be sold as is, where is and without warranty, representation or recourse of any kind or nature, express or implied, at law or in equity with respect to the Assets,

---

[2] As defined in the Bidding Procedures.

without limitation, any representation or warranty with respect to the nature or extent of the Debtors'
interest in the Assets, merchantability or fitness for any particular purpose, and any and all such
other representations and warranties are hereby expressly disclaimed.

7.    The provisions of 11 U.S.C. §§ 363(b) and (f) have been complied with as to the
Asset Sale.

8.    The Rocale APA (including all exhibits and schedules thereto and all terms and
conditions thereunder) is hereby approved in all respects, and the Debtors' assumption of the
executory contracts listed on Exhibit A to the Notice of Assumption and Assignment [Dkt. No. 84-3]
and assignment of the same to the Purchaser is hereby approved but not required unless requested by
Purchaser.    Any executory contracts listed on Exhibit A to the Notice of Assumption and
Assignment [Dkt. No. 84-3] which are not assumed and assigned to the Purchaser in connection with
the closing of the Asset sale shall be deemed rejected.    No later than three (3) business days
following the closing of the sale of Assets to Purchaser, the Debtors will provide notice to each
counterparty to an executory contract as to whether its contract has been assumed and assigned to the
Purchaser or Rejected. Purchaser shall pay the cure amounts reflected on Exhibit A to the Notice of
Assumption and Assignment with respect to any executory contracts for which it elects to take an
assignment.

9.    The Debtors are authorized and directed, pursuant to 11 U.S.C. §§ 105, 363(b) and
(f) and 365, to execute and deliver, and empowered to fully perform under, consummate and
implement, the Rocale APA, together with all additional instruments and documents that may be
reasonably necessary or desirable to implement the Rocale APA, including, but not limited to, a
transition services agreement, and to take all further actions as may be requested by the Purchaser for

10

the purpose of assigning, transferring, granting, conveying and conferring to the Purchaser, or reducing to the Purchaser possession, any or all of the Assets (including, without limitation, any executory contracts to be assumed and assigned to the Purchaser pursuant to the Rocale APA).

10.    Neither the purchase of the Assets by the Purchaser, nor the transactions contemplated hereby, will cause the Purchaser or any of its affiliates to be deemed a successor in any respect to the Debtors' businesses within the meaning of any federal, state or local revenue, pension, ERISA, tax, labor or environmental law, rule or regulation or under any products liability law or doctrine with respect to Debtors' liability under such law, rules, regulations or doctrines. Except as expressly provided in the Rocale APA and this Order, the Purchaser has not assumed and shall not be liable for any of the Debtors' Accounts Payable or Liabilities resulting from the ownership, use, operation or maintenance of the Assets and operation of the Business, and in no event shall Purchaser (a) be deemed the successor of the Debtors, (b) have, de facto or otherwise, merged with or into the Debtors or (c) be a mere continuation of the Debtors or the enterprises of the Debtors. To the greatest extent permitted by law, the Purchaser shall have no liability or obligation under the New York State or Federal WARN Act (N.Y. Lab. Law §§860 to 860(i), 29 U.S.C. §§ 2101 et seq.) or the Comprehensive Environmental Response Compensation and Liability Act or any federal, state or local environmental law by virtue of the Purchaser's purchase of the Assets.

11.    Upon the Closing of the Asset Sale, as of the Closing and pursuant to the terms of the Rocale APA, the transfer of the Assets to the Purchaser will be a legal, valid, enforceable, and effective transfer of the Assets, and will vest the Purchaser with all right, title, and interest of the Debtors in the Assets free and clear of all liens, claims, encumbrances and interests, including, but not limited to: (i) those that purport to give to any party a right or option to effect any forfeiture,

11

modification, right of first refusal, tag-along rights, restrictions on sales to competitors, rights based

on a change of control as a result of the transactions contemplated in the Rocale APA, or termination

of the Debtors' or the Purchaser's interest in the Assets, or any similar rights; (ii) those relating to

taxes arising under or out of, in connection with, or in any way relating to the operation of the Assets

prior to the Closing (including without limitation any and all liens which may arise under any state

or federal law or statute by reason of Debtors' failure to comply with any otherwise applicable

statute relating to bulk transfer or bulk sale law), (iii) all mortgages, deeds of trust, security interests,

conditional sale or other title retention agreements, pledges, liens, judgments, demands,

encumbrances, options, rights of first refusal or charges of any kind or nature, if any, including, but

not limited to, any restriction on the use, voting, transfer, receipt of income or other exercise of any

attributes of ownership, (iv) all debts arising in any way in connection with any agreements, acts, or

failures to act, of the Debtors or any of the Debtors' predecessors or affiliates, claims (as that term is

defined in the Bankruptcy Code), obligations, liabilities, demands, guaranties, options, rights,

contractual or other commitments, restrictions, interests and matters, of any kind and nature,

whether known or unknown, contingent or otherwise, whether arising prior or subsequent to the

commencement of this bankruptcy case, and whether imposed by agreement, understanding, law,

equity or otherwise, including but not limited to claims arising under doctrines of successor liability,

with any and all such liens, claims, encumbrances or other interests in such Assets to attach to the

proceeds of the sale, including without limitation, any and all escrows established in connection

herewith, in the order of their priority, with the same validity, force and effect which they now have

as against such Assets.

12.  Except as may be expressly permitted by the Rocale APA, all persons and entities holding or purporting to hold or who may subsequently hold or allege to hold any liens or interests of any kind and nature with respect to the Assets of the Debtors or the proceeds from the Asset Sale are hereby barred from asserting such liens or interests against the Purchaser and its successors or assigns, the Assets or the proceeds from the Asset Sale.

13.  If any person or entity that has filed financing statements or other documents or agreements evidencing encumbrances on the Assets of the Debtors shall not have delivered to the Debtors prior to the Closing (in proper form for filing and executed by the appropriate parties), termination statements, instruments of satisfaction, releases of all encumbrances that the person or entity has with respect to such Assets, the Purchaser is hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to such Assets.

14.  As evidenced by the Certificate of Service previously filed with this Court, proper, timely, adequate and sufficient notice of the proposed Asset Sale and proposed distribution of sale proceeds has been provided by the Debtors to all relevant parties, and no other or further notice is required.

15.  The foregoing notwithstanding, the provision of this Order authorizing the sale and assignment of the Assets of the Debtors free and clear of liens and interests shall be self-executing, and notwithstanding the failure of the Debtors, the Purchaser, or any other party to execute, file or obtain releases, termination statements, assignments, consents or other instruments to effectuate, consummate and/or implement the provisions hereof or the Rocale APA with respect to the sale and assignment of such Assets, all liens and interests on such Assets shall be deemed released and shall

13

attach to the proceeds of the Asset Sale pursuant to this Order.  All persons or entities that are presently, or at the Closing, in possession of any of the Assets of the Debtors, are hereby directed to surrender possession of such Assets to the Purchaser, or its designee at the Closing (except to the extent the Rocale APA expressly provides otherwise).

16.    This Order shall be binding upon and govern the acts of all entities, including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state and local officials, and all other persons or entities who may be required by operation of law, the duties of their office or contract to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report to or insure title or state of title in or to any of the Assets of the Debtors.  Each and every federal, state and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Rocale APA, including without limitation, documents and instruments for recording in any governmental agency or department required to transfer to the Purchaser any and all licenses under the Debtors' ownership necessary for the operation associated with the Assets, and county and state offices wherein termination statements under the Uniform Commercial Code are authorized to be filed.

17.    From and after entry of this Order, neither the Debtors nor any creditor or other party in interest shall take or cause to be taken any action that would interfere with the transfer of the Assets of the Debtors to the Purchaser in accordance with the terms of this Order.

18.    No bulk sales law or any similar law of any state or other jurisdiction shall apply in any way to the transactions authorized herein.

14

19.     Because the Court finds that the Purchaser is a good faith purchaser within the meaning of 11 U.S.C. §363(m), in the event that the parties to the Asset Sale consummate the transactions contemplated thereby while an appeal of this Order is pending, the Purchaser shall be entitled to rely upon the protections of 11 U.S.C. § 363(m), absent any stay pending appeal granted by a court of competent jurisdiction prior to such consummation.

20.     The Rocale APA and any related agreements, documents or other instruments may be modified, amended or supplemental by the parties thereto in accordance with the terms thereof without further order of the Court, provided that any such modification, amendment or supplement is not material and adverse to the Debtors or the estates.

21.     As the Asset Sale is fair and reasonable and negotiations were conducted in good faith, and the transactions contemplated by the Rocale APA have been bargained for and undertaken by the Debtors and the Purchaser, the Asset Sale and proposed distribution of sale proceeds approved by this Order is not subject to avoidance pursuant to 11 U.S.C. § 363(n) of the Bankruptcy Code.

22.     The Debtors are authorized to execute such other documents as are necessary or desirable to implement this Order.

23.     Nothing contained in any plan of reorganization (or liquidation) confirmed in this case or the order of confirmation confirming any plan of reorganization (or liquidation) shall conflict with or derogate from the provisions of the Rocale APA or the terms of this Order.  Further, the provisions of this Order and any actions taken pursuant hereto shall survive the entry of any order converting the Debtors' cases from Chapter 11 to a case under Chapter 7 of the Bankruptcy Code, or dismissing the cases.

15

24.     The terms and provisions of the Rocale APA, together with the terms and provisions of this Order, shall be binding in all respects upon, and shall inure to the benefit of, (a) the Debtors, their estates, any trustee appointed in this case (whether in Chapter 7 or Chapter 11), their creditors, (b) the Purchaser and its respective affiliates, successors and assigns, and (c) any affected third parties, including but not limited to, any and all persons asserting a claim against or interest in the Debtors' estates or any of the Assets.

25.     As provided by Interim Bankruptcy Rule 6004(h), and Bankruptcy Rules 6006(d) and 7062, because time is of the essence, this Order shall be effective and enforceable as of entry of this Order and the fourteen (14)-day stay period provided for in Rule 6004(h) of the Federal Rules of Bankruptcy Procedure is hereby waived.

26.     The provisions of this Order are non-severable and mutually dependent.

27.     The Purchaser has submitted the highest and best offer for the Assets and is a purchaser acting in good faith as that term is utilized in the Title 11 of the United States Code.

28.     Pursuant to sections 365(b), (c) and (l) of the Bankruptcy Code, the Debtors are authorized to assume and assign all executory contracts and unexpired leases of the Debtors to the Purchaser. Purchaser shall pay all cure costs. If the parties are unable to determine if a default exists, the cure amount shall be set at $0.00. Pursuant to sections 365(b)(2) and (f) of the Bankruptcy Code, upon transfer of the executory contracts and unexpired leases to the Purchaser, (a) the Purchaser shall have all of the rights of the respective Debtor thereunder and each provision of such contract and lease shall remain in full force and effect for the benefit of the Purchaser notwithstanding any provision in any such executory contract or unexpired lease or in applicable law that prohibits, restricts, or limits in any way such assignment or transfer and (b) no executory

16

contract or unexpired lease may be terminated, and the rights of any party, including pursuant to any "change of control clause", may not be modified in any respect by any other party thereto as a result of the transactions contemplated by the auction sale.

29.    This Court shall and hereby does retain sole and exclusive jurisdiction to determine any dispute, issue or other matter arising in connection with the Asset Sale or this Order.

###

# EXHIBIT "A"

# AGREEMENT OF

## PURCHASE AND SALE OF ASSETS

### By and Among

## ROCALE, LLC

## EMPIRE FARMSTEAD BREWERY, INC.

### and

## EMPIRE BREWING PROPERTIES, LLC

**Dated as of October 18, 2019**

67143442.8

# TABLE OF CONTENTS

Page

ARTICLE I THE ASSET PURCHASE TRANSACTION ................................................. 1
    **SECTION 1.01**   PURCHASE AND SALE OF ASSETS ........................................ 1
    **SECTION 1.02**   EXCLUDED ASSETS............................................................ 2
    **SECTION 1.03**   PURCHASE PRICE ............................................................. 2
    **SECTION 1.04**   PAYMENT OF PURCHASE PRICE..................................... 2
    **SECTION 1.05**   NO ASSUMPTION OF LIABILITIES ................................. 2
    **SECTION 1.06**   ALLOCATION OF PURCHASE PRICE .............................. 2
ARTICLE II CERTAIN AGREEMENTS AMONG THE PARTIES.......................... 3
    **SECTION 2.01**   TAXES, RENTS AND UTILITY CHARGES...................... 3
    **SECTION 2.02**   OPERATION OF BUSINESS ............................................. 3
    **SECTION 2.03**   BIDDING PROCEDURES AND BID PROTECTIONS .......... 3
    **SECTION 2.04**   INTENTIONALLY OMITTED ........................................... 3
    **SECTION 2.05**   APPROVAL ORDER........................................................... 4
    **SECTION 2.06**   FURTHER ASSURANCES ................................................. 4
    **SECTION 2.07**   BEST EFFORTS................................................................. 5
    **SECTION 2.08**   PRE CLOSING BUSINESS OPERATION ........................... 5
    **SECTION 2.09**   CURE OBLIGATIONS....................................................... 5
    **SECTION 2.10**   **COMPLIANCE WITH BULK SALES LAW**........................ 5
    **SECTION 2.11**   ACCESS TO INFORMATION ............................................ 5
    **SECTION 2.12**   BANKRUPTCY PLEADINGS ............................................ 6
ARTICLE III REPRESENTATIONS, WARRANTIES AND UNDERTAKINGS ...... 6
    **SECTION 3.01**   GENERAL REPRESENTATIONS, WARRANTIES AND
                 UNDERTAKINGS BY SELLERS ...................................... 6
    **SECTION 3.02**   REAL ESTATE MATTERS................................................ 8
    **SECTION 3.03**   Environmental Representations ....................................... 10
    **SECTION 3.04**   GENERAL REPRESENTATIONS, WARRANTIES AND
                 UNDERTAKINGS OF BUYER........................................... 11
ARTICLE IV CLOSING ................................................................................... 12
    **SECTION 4.01**   CLOSING........................................................................ 12
    **SECTION 4.02**   DELIVERY OF ASSETS; RISK OF LOSS ........................ 13
    **SECTION 4.03**   CLOSING CONDITION .................................................... 13
ARTICLE V TERMINATION ........................................................................... 14
    **SECTION 5.01**   TERMINATION............................................................... 14
ARTICLE VI MISCELLANEOUS ...................................................................... 15
    **SECTION 6.01**   ENTIRE AGREEMENT.................................................... 15
    **SECTION 6.02**   SUCCESSORS AND ASSIGNS ........................................ 15
    **SECTION 6.03**   COUNTERPARTS ........................................................... 16
    **SECTION 6.04**   NOTICES........................................................................ 16
    **SECTION 6.05**   HEADINGS .................................................................... 17
    **SECTION 6.06**   MODIFICATION AND WAIVER...................................... 17
    **SECTION 6.07**   EXHIBITS ...................................................................... 17
    **SECTION 6.08**   ADDITIONAL INSTRUMENTS AND FURTHER ASSURANCES....... 17

67143442.8

i

**SECTION 6.09**   SURVIVAL ............................................................................................. 17

**SECTION 6.10**   GOVERNING LAW ................................................................................. 17

**SECTION 6.11**   SEVERABILITY ..................................................................................... 17

**SECTION 6.12**   SPECIFIC PERFORMANCE ................................................................. 17

**SECTION 6.13**   BANKRUPTCY PROCESS ..................................................................... 17

**SECTION 6.14**   NOTICE TO CREDITORS ..................................................................... 19

67143442.8

EXHIBITS

| Exhibit 1.01(a) | Personal Property |
| Exhibit 1.01(b) | Real Property |
| Exhibit 1.01(c) | Inventory |
| Exhibit 1.01(f) | Assigned Contracts |
| Exhibit 1.02 | Excluded Assets |
| Exhibit 2.03 | Bidding Procedures Order |
| Exhibit 4.01(a)(i) | General Assignment and Bill of Sale |

## AGREEMENT OF PURCHASE AND SALE OF ASSETS

**THIS AGREEMENT** is made effective as of the 18th day of October, 2019, by and among ROCALE, LLC, a New York limited liability company (hereinafter "Buyer"); EMPIRE FARMSTEAD BREWERY, INC., a New York corporation ("Brewery") and EMPIRE BREWING PROPERTIES, LLC a New York limited liability company f/k/a Chapman Properties LLC ("Properties") with Brewery and Properties collectively referred to herein as "Sellers". Feldmeier Equipment, Inc. is a party to this Agreement solely to confirm its guaranty of Buyer's performance hereunder.

## RECITALS

**WHEREAS,** Sellers own real and personal property located in Cazenovia, NY with respect to which Sellers operate a farmstead brewery and related restaurant known as Empire Farmstead Brewery (the "Business");**WHEREAS,** Sellers filed for for protection under Chapter of Title 11 of the United States Code (the "Bankruptcy Code") on August 20, 2019; and

**WHEREAS,** Buyer desires to purchase substantially all of the assets of the Sellers through a sale of assets by the bankruptcy estate of Sellers pursuant to Section 363(f) of the Bankruptcy Code, and Sellers desire to facilitate such sale of assets pursuant to the terms of this Agreement.

**NOW, THEREFORE,** in consideration of the mutual covenants and agreements herein contained, Buyer and Sellers agree as follows:

## ARTICLE I
## THE ASSET PURCHASE TRANSACTION

**SECTION 1.01**    **PURCHASE AND SALE OF ASSETS**.  Subject to the terms and conditions of this Agreement, on the Closing Date (as such term is defined in Section 4.01 of this Agreement) Sellers shall sell, assign, transfer and convey, and Buyer shall purchase, assume, and accept legal title to all assets, properties and rights of Sellers of any kind or nature [associated with the Business] whether owned, leased or licensed, excepting only the Excluded Assets (defined below) (all such assets to be purchased hereunder are hereinafter collectively referred to as the "Assets"), free and clear of all liens, claims and encumbrances to the maximum extent permitted by Sections 363 and 365 of the Bankruptcy Code:

    **(a)**    **Personal Property**.  All tangible property of the Business, including but not limited to tanks, piping, bottling lines, furniture, fixtures, computers, and other personal property, including, without limitation, those items generally described on Exhibit 1.01(a), attached hereto and incorporated herein (the "Personal Property"), but the Personal Property shall not include the Excluded Assets;

    **(b)**    **Real Property**.  All real property which is described on Exhibit 1.01(b), attached hereto and incorporated herein (the "Real Property");

67143442.8

(c) **Inventory**. All inventory on hand and associated with the Business as of the close of business as of the Closing Date, including, without limitation, as described by category on Exhibit 1.01(c) (the "Inventory");

(d) **Business Records**. All business records and books associated with the Assets or the operation of the Business (the "Business Records").

(e) **Permits**. To the extent legally transferable, the Permits set forth on Schedule 1.01(e). Buyer shall pay any fees and costs required to transfer such Permits;

(f) **Contracts**. The Contracts set forth on Exhibit 1.01(f), which contracts are to be assumed and assigned to Buyer at the Closing (collectively, the "Assigned Contracts");

(g) **PILOT**. The Payment in Lieu of Tax Agreement dated June 1, 2015 (the "PILOT") between Madison County Industrial Development Agency and Brewery, to the extent the PILOT is assignable to Buyer; and

(h) **Other**. All other assets (including intangible assets) of Seller relating to the Business, including the corporate name "Empire Farmstead Brewery, Inc.", and not specifically included in the definition of Excluded Assets.

SECTION 1.02    **EXCLUDED ASSETS**. The Assets shall not include any contract other than the Assigned Contracts, , accounts receivable and cash of Sellers that are associated with the operation of the Business prior to the Closing, any Assets rejected by Buyer, and those additional assets of Sellers that are identified on Schedule 1.02 (collectively, the "Excluded Assets").

SECTION 1.03    **PURCHASE PRICE**. The purchase price for the Assets (the "Purchase Price") shall be Three Million Four Hundred Forty Thousand Dollars ($3,440,000).

SECTION 1.04    **PAYMENT OF PURCHASE PRICE**. The Purchase Price shall be paid in cash by Buyer to Sellers, in the form of a wire transfer to an account or accounts designated by Sellers and approved by the Bankruptcy Order.

SECTION 1.05    **NO ASSUMPTION OF LIABILITIES**. Buyer shall not assume any debts, obligations or liabilities of Sellers except for liabilities and obligations of Sellers with respect to Assigned Contracts first arising on or after the Closing Date and relating to periods after Closing.

SECTION 1.06    **ALLOCATION OF PURCHASE PRICE**. Buyer and Sellers shall mutually agree on the allocation of the Purchase Price among the various Assets prior to closing, and any tax filings of the parties shall be made consistent with such mutually agreed upon allocation.

67143442.8

2

## ARTICLE II
## CERTAIN AGREEMENTS AMONG THE PARTIES

**SECTION 2.01**      <u>**TAXES, RENTS AND UTILITY CHARGES**</u>.   Real property taxes and personal property taxes due and payable in 2019, together with utility charges, shall be prorated between Buyer and Sellers as of the Closing Date.  Any sales tax liability as a result of this transaction shall be borne by Buyer.  Sellers shall pay the New York State real property transfer taxes. Any delinquent real property taxes, water bills, and other local taxes or fees shall be paid and brought current by Sellers on or before the Closing or adjusted and paid at Closing.  Proof of payment of all of the foregoing items shall be furnished to Buyer at least five (5) days prior to Closing.

**SECTION 2.02**      <u>**OPERATION OF BUSINESS**</u>.   Subject to the requirements of, and the obligations imposed upon, Sellers as debtor-in-possession pursuant to the Bankruptcy Code, from the date hereof and until the transaction has been consummated or abandoned as contemplated herein, Sellers shall operate the Business in the ordinary course and consistent with acting as a debtor-in-possession in a Chapter 11 bankruptcy case, shall use commercially reasonable efforts to maintain the goodwill associated with the Business and the relationships with the employees, customers, and suppliers of the Business. Without limiting the generality of the foregoing, (i) Sellers will maintain the Assets in their present condition, normal wear and tear excepted, (ii) Sellers will not sell or dispose of any of the Assets; (iii) Sellers will not make payments or enter into any contractual commitments to any employee of the Sellers other than payments of salary and wages and other benefits and the reimbursement of reasonable documented business expenses, in each case, in the Ordinary Course of Business consistent with past practice; (iv) Sellers will not fail to pay any material Tax on or before the date when it becomes due and payable; (v) Sellers shall not take any action or omit to take any action which would reasonably be expected to have a Material Adverse Effect on the Assets or on Sellers' ability to conduct the Business; and (vi) Sellers shall maintain their inventory at levels sufficient to operate the Business and consistent with past practice.  Further, Sellers shall not, without Buyer's prior written consent, engage in any material transactions affecting the Assets outside of the Ordinary Course of Business.

**SECTION 2.03**      <u>**BIDDING PROCEDURES AND BID PROTECTIONS**</u>. Notwithstanding execution of this Agreement, the Buyer acknowledges that the sale of the Assets will be subject to higher or better offers.  To the extent there is interest by other potential purchasers, the Sellers may hold an auction ("Auction") at a time and place agreed upon by parties prior to the hearing on approval of the sale of the Assets.  Any person that wishes to bid at the Auction must comply with the procedures more fully described in Exhibit 2.03 (the "Bidding Procedures") to become a "Qualified Bidder." The Sellers shall seek an order from the Bankruptcy Court approving the Bidding Procedures (the "Bidding Procedures Order")

**SECTION 2.04**      **BREAK-UP FEE.**

Intentionally omitted.

67143442.8

3 .

**SECTION 2.05** **APPROVAL ORDER.**

(a)    Prior to the Closing, and subject to the provisions of this Agreement, Buyer and Sellers shall use their commercially reasonable efforts to obtain entry of an order or orders by the Bankruptcy Court pursuant to Sections 363 and 365 of the Bankruptcy Code (the "*Approval Order*"), which shall approve this Agreement and the transactions described herein. The Approval Order shall be in form and substance acceptable to Buyer. Without limiting the generality of the foregoing, the Approval Order shall include the following provisions, together with other customary and usual terms for transactions of this size and type that are acceptable to Sellers and Buyer:

(i)    that Sellers may sell, transfer and assign the Assets to Buyer pursuant to this Agreement and Bankruptcy Code Sections 105, 363 and 365, as applicable, and that any Executory Contract or Unexpired Lease not assigned to Buyer is rejected;

(ii)    the transfers of the Assets by Sellers to Buyer (A) vest or will vest Buyer with all right, title and interest of Sellers in and to the Assets, free and clear of all liens, and (B) constitute transfers for reasonably equivalent value and fair consideration under the Bankruptcy Code and the laws of the State of New York;

(iii)    the transactions contemplated by this Agreement are undertaken by Buyer and Sellers at arm's length, without collusion and in good faith within the meaning of Section 363(m) of the Bankruptcy Code, and such parties are entitled to the protections of Section 363(m) of the Bankruptcy Code;

(iv)    a determination that selling the Assets free and clear of all liens is in the best interest of Sellers' estate;

(v)    that Buyer shall not assume any liabilities of Sellers and shall not be deemed to be a successor to Sellers.

(b)    If the Approval Order or any other orders of the Bankruptcy Court relating to this Agreement shall be appealed by any person (or a petition for certiorari or motion for rehearing or re-argument shall be filed with respect thereto), each party hereto agrees to use commercially reasonable efforts to obtain an expedited resolution of such appeal; provided, however, that nothing herein shall preclude the parties hereto from consummating the transactions if the Approval Order shall have been entered and has not been stayed in which event Buyer shall be able to assert the benefits of §363(m) of the Bankruptcy Code.

**SECTION 2.06 FURTHER ASSURANCES**. Upon the terms and subject to the conditions contained herein, the parties agree, both before and after the Closing, (i) to use all reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable to consummate and make effective the transactions contemplated by this Agreement, (ii) to execute any documents, instruments or conveyances of any kind and provide any records, which may be reasonably necessary or advisable to carry out

67143442.8

4

any of the transactions contemplated hereunder or to make any post-closing tax or other types of filings and (iii) to cooperate with each other in connection with the foregoing.

**SECTION 2.07** **BEST EFFORTS**. Buyer and Sellers shall, as soon as practicable, commence to take all action required to obtain all consents, approvals and agreements of, and to give all notices and make all other filings with, any third parties, including governmental authorities, necessary to authorize, approve or permit the full and complete sale, conveyance, assignment or transfer of the Assets, and Sellers shall cooperate with Buyer with respect thereto. In addition, subject to the terms and conditions herein provided, each of the parties hereto covenants and agrees to use its best efforts to take, or cause to be taken, all action or do, or cause to be done, all things necessary, proper or advisable under applicable laws and regulations to consummate and make effective the transactions contemplated hereby and to cause the fulfillment of the parties' obligations hereunder.

**SECTION 2.08** **PRE CLOSING BUSINESS OPERATION**. Sellers agree to continue the Business in its normal course until Closing as a debtor-in-possession under the Bankruptcy Code.

**SECTION 2.09** **CURE OBLIGATIONS**. Not later than two (2) weeks prior to the Auction Date, Sellers shall deliver to Buyer a calculation of the Cure Obligations with respect to the Assigned Contracts. Upon receiving such calculation Buyer may elect, at any time on or prior to the commencement of the Auction, to remove any Contract from the list of Assigned Contracts and reclassify such Contract as an Excluded Asset, *provided, however*, that, in the event the Bankruptcy Court subsequently determines that the Cure Obligations for any Assigned Contract is greater than that set forth in Seller's calculation, Buyer may elect to reclassify such Contract as an Excluded Asset at any time prior to the earlier to occur of (i) the Closing or (ii) the day that is five Business Days following such determination by the Bankruptcy Court.

**SECTION 2.10** **COMPLIANCE WITH BULK SALES LAW**. Buyer shall file the required notice of bulk sale with the New York State Department of Taxation and Finance ("DTF") and shall promptly notify Sellers upon receipt of the tax clearance certificate or any other material correspondence received from DTF. Buyer shall be under no obligation to close the transaction until such time as Buyer receives a purchaser's release-bulk sale (Form AU-197.1) from DTF, which states in relevant part that Buyer shall purchase Sellers' assets free and clear of any liability for the sales and use Tax obligations of Sellers and any prior owner of the Assets. In the event that DTF provides Buyer with a notice of claim to purchaser (Form AU 196.2), the entire Purchase Price shall be held in escrow. Upon Buyer's receipt of a notice and demand for payment of sales and use taxes due (Form AU-16.1) from DTF, the amount of the unpaid sales and use Tax liability, if any, shall be deducted from the escrowed Purchase Price and remitted to DTF, and any balance shall be remitted to Sellers.

**SECTION 2.11** **ACCESS TO INFORMATION**. From the date hereof through the Closing Date, and upon reasonable advance notice received from Buyer, Sellers shall give Buyer and its authorized representatives reasonable access to Sellers' facilities and Books and Records relating to the Assets.

67143442.8

5

SECTION 2.12    **BANKRUPTCY PLEADINGS.** Sellers agree to share all draft pleadings that Sellers intend to file in their respective Chapter 11 Cases with Buyer prior to the filing of the pleadings and Sellers agree to notify Buyer of any and all objections or other responses to any pleadings filed by Sellers in the bankruptcy case. The Parties agree to cooperate and coordinate, whenever reasonably possible, all pleadings, arguments, and public statements regarding the operation of the Business and the transaction contemplated herein.

## ARTICLE III
## REPRESENTATIONS, WARRANTIES AND UNDERTAKINGS

SECTION 3.01    **GENERAL REPRESENTATIONS, WARRANTIES AND UNDERTAKINGS BY SELLERS.** In addition to the specific representations and warranties by Sellers set forth elsewhere in this Agreement, Sellers hereby make the following general representations and warranties to Buyer with the intention that Buyer may rely upon the same:

(a)    **Organization and Standing.** Brewery and Properties are duly organized and validity-existing in good standing under the laws of the State of New York and have the power to carry on their business as it is now being conducted.

(b)    **Authority Relative to this Agreement; Execution and Binding Effect.** Sellers have full power and authority to execute and deliver this Agreement and, subject to receipt of any necessary Bankruptcy Court approval in accordance with the Bankruptcy Code, to consummate the transactions contemplated hereby. The execution and delivery of this Agreement and the consummation of the transaction have been duly and validly approved and adopted by the boards of directors of Properties and Brewery, and, except for Bankruptcy Court approval, no other proceedings or approvals on the part of Sellers are necessary to approve this Agreement and to consummate the transactions. Assuming due authorization, execution and delivery by Buyer, this Agreement constitutes, and at the Closing will constitute, the valid and binding obligation of Sellers, enforceable against Sellers in accordance with its terms, except as such enforcement may be limited by the effect of bankruptcy, insolvency, reorganization, receivership, conservatorship, arrangement, moratorium or other laws affecting or relating to the rights of creditors generally.

(c)    **No Defaults.** Subject to receipt of any necessary Bankruptcy Court approval in accordance with the Bankruptcy Code, the execution and delivery by Sellers of this Agreement and the consummation of the transactions do not and will not with or without the giving of notice or the lapse of time, or both, conflict with, or result in the breach of or constitute a default under, or result in the modification, cancellation, lapse or termination of, or limitation, or curtailment under, or violate any (1) provision of Law, or (2) agreement, employee benefit plan, contract, lease, power of attorney, commitment, instrument, insurance policy, arrangement, undertaking, order, decree, ruling or injection to which Sellers are subject or a party or by which it is bound (or with respect to which its properties or assets are subject or bound).

(d)    **Governmental and Other Consents.**    Except for the receipt of any necessary Bankruptcy Court approval in accordance with the Bankruptcy Code, no consent, notice, authorization or approval of, or exemption by, or filing with or notifications to any Governmental Authority or any other person or entity, whether pursuant to contract or otherwise, is required in connection with the execution and delivery by Sellers of this Agreement and the consummation of the transaction.

(e)    **Ownership of Assets.**    On the Closing Date, Sellers will convey title to all of the Assets to be sold, transferred, assigned and conveyed hereunder, free and clear of all liens, security interests, defects and encumbrances, to the fullest extent permitted under Sections 363 and 365 of the Bankruptcy Code.

(f)    **Litigation.**    There is no legal, administrative or arbitration proceeding, suit, action of any nature or Order, judgment, writ, injunction, award, or decree, claim, investigation or inquiry ("Litigation") relating to any Acquired Assets or the transactions contemplated by this Agreement, pending or asserted against Seller, by or before any Government or by or on behalf of any Third Party that would adversely affect the ability of Sellers to consummate the sale of Assets to Buyer in accordance with the Approval Order.

(g)    **Brokers.**    Sellers have not used any broker or finder in connection with the transactions contemplated hereby. Any fee commission due to any party will be paid by Sellers, and Buyer will not be liable for or suffer any losses in respect of any claims with respect to any such fee or commission.

(h)    **Compliance with Laws.**    Seller is in compliance with, and not in violation of, any Legal Requirement applicable to the operation of the Business. Seller has not received any written notification from any authority of the Government asserting that it is not in compliance with any Legal Requirement applicable to the operation of the Business. Notwithstanding the foregoing, Buyer acknowledges that the Business is subject to a consent order with the town of Cazenovia, NY with respect to discharge of wastewater from the Brewery.

(i)    **Insurance.**    Sellers have maintained such fire, liability, casualty and other forms of insurance on an occurrence basis as are reasonable and appropriate for companies similarly situated. All such policies are in full force and effect and provide coverage in such amounts and against such risks as are reasonable and appropriate given the nature of the Business.

(j)    **Financial Statements.**    Sellers have provided Buyer with true, correct, and complete copies of all of their internally prepared financial reports for the six months ended June 2019 and fiscal year to date and externally prepared financial statements for the last five (5) fiscal years ended December 31, 2018 (collectively, the "Financial Statements"). The Financial Statements have been prepared materially in accordance with GAAP applied on a consistent basis throughout the period involved. The Financial Statements are based on the books and records of the Business, and fairly present the financial condition of the Business as of the respective dates they were prepared and the

67143442.8

7

results of the operations of the Business for the periods indicated. Sellers have no material Liabilities, except Liabilities (i) set forth in the Financial Statements; (ii) incurred in the Ordinary Course of Business since June 30, 2018; or (iii) incurred in connection with this Agreement.

(k)    **Material Contracts.**    Schedule 3.01(k) contains a true, correct and complete list of all Material Contracts of Sellers or to which Sellers are bound and/or affecting the Assets.

(l)    **Taxes.**    Sellers have filed all Tax Returns required to be filed and have timely paid all Taxes due and owing (whether or not shown on any filed Tax Return), other than Taxes contested in good faith. There is not currently any audit exam, notice of deficiency, refund litigation, claim, or notice of assessment or proposed assessment pending or threatened, involving Seller, and there is no reasonable basis for any such deficiency, assessment or claim relating to Taxes. Notwithstanding the foregoing, it is understood that Sellers are delinquent in the payment of certain State and Federal excise taxes, which will be paid by Sellers prior to the Closing with no contribution from Buyer.

### SECTION 3.02    REAL ESTATE MATTERS.

(a)    **Evidence of Title.**    Sellers shall, cause to be delivered to Buyer as soon as possible after the date of execution of this Agreement (unless a later date shall be agreed upon in writing by Buyer), an updated survey (dated after the date of this Agreement and certified as directed by Buyer), a current abstract of title and real estate tax search and any title insurance policy(ies) previously issued to Sellers relating to the Real Property described on Exhibit 1.01(b). Within 30 days after execution of this Agreement, Buyer shall secure commitments for owner's title insurance policies to the Real Property described on Exhibit 1.01(b). Buyer shall be allowed 15 days after receipt of the commitment for title insurance for examination of title and the making of any objections to title based on the marketability of title and any other items that materially impair the continued use and operation of the Real Property as shown in the continued abstract and the schedule of exceptions to coverage included as part of such commitment for title insurance, said objections to be made in writing prior to the Closing or be deemed to have been waived. If any objections to title are so made and are not removed by Sellers prior to the Closing Date, THEN, if such title defects are correctable, Buyer shall purchase such Real Property subject to deduction from the Purchase Price by an amount to be mutually agreed upon between Sellers and Buyer, and subject to prior approval by the mortgagee, Community Bank N.A., to cover the expenses of correcting such title defects. However, if the title defects are not correctable, or if Sellers and Buyer cannot agree upon the amount necessary to correct such title defects, or if the mortgagee, Community Bank N.A. does not agree to the reduction in the Purchase Price, then Buyer shall have the option of (i) electing to waive such defects and to take such parcel(s) subject to such defects; or (ii) terminating this Agreement upon written notice to Sellers, in which case neither party shall have any further obligation hereunder.

(b)    **Conveyance.**    The Real Property to be conveyed to Buyer hereunder shall be conveyed by Warranty Deed with Lien Covenant in standard form and substance, free

and clear of all liens and encumbrances that materially impair the continued use and operation of the Real Property or as otherwise agreed by Buyer.

(c)    **Real Property Representations.**

(i)    Sellers represent that there [are/are not] wells on the Real Property and shall provide Buyer with required well certificates at the Closing.

(ii)    The Real Property currently complies with (i) all applicable Legal Requirements including but not limited to all building codes, zoning ordinances, health and safety regulations, and the Americans with Disabilities Act (and any similar state and municipal laws) and (ii) all declarations, easements, rights of way, restrictions and covenants affecting all or any portion of the Real Property.

(iii)    Sellers have not received any written notice of, nor is there pending, any condemnation proceeding (or transfer in lieu thereof), foreclosure proceeding, zoning proceeding or land use proceeding affecting the Real Property or any part thereof; to the Knowledge of Sellers, no such proceedings are anticipated.

(iv)    There are no leases, subleases or tenancies affecting the Real Property or any part thereof. There are no tenants or subtenants occupying all or any portion of the Real Property.

(v)    No Seller is a foreign entity under the Foreign Investment Real Property Tax Act ("FIRPTA").

(vi)    All buildings and improvements on the Real Property are structurally sound and all mechanical systems (such as the heating, ventilating, air conditioning, plumbing, electrical, drainage and security systems) are in good working order, ordinary wear and tear excepted. The Real Property is served by public water and public sewer.

(vii)    Properties is the sole, fee simple owner of the Real Property.

(viii)    No third party has any agreement, contract, memorandum of understanding, option, right of first refusal, letter of intent, or other right to acquire or lease all or any part of or any interest in the Real Property.

(ix)    All assessments, sewer charges, water bills, PILOT payments and utility charges affecting the Real Property have been paid when due and are current.

(x)    The Real Property is not, and has not for the past 5 years, been subject to any agricultural assessment.

(xi)    Sellers have certificates of occupancy for all buildings and improvements on the Real Property (copies of which have been provided to

Buyer). Sellers have all Permits necessary to use, operate and occupy the Real Property.

(xii)     All utilities are available to the Real Property, including public water, public sanitary sewer, storm sewer, electricity, gas, telephone, cable, and wifi and fiber optic.

(xiii)     All work, materials and labor in connection with any construction on the Real Property have been paid in full, and no contractor, subcontractor, materialman or other person or entity has or shall have the right to file any mechanic's lien on the Real Property.

**SECTION 3.03     Environmental Representations.**     As used in this Agreement, the following terms shall have the following meanings:

"**Environmental Law**" means any federal, state, county, municipal, local or other statute, law, ordinance or regulation which may relate to or deal with the environment and is applicable to the Real Property, all as may be from time to time amended.

"**Hazardous Substances**" means asbestos, ureaformaldehyde, polychlorinated biphenyls ("PCBs"), nuclear fuel or material, chemical waste, radioactive material, explosives, known carcinogens, petroleum products and by-products and other dangerous, toxic or hazardous pollutants, contaminants, chemicals, materials or substances listed or identified in, or regulated by, any Environmental Law.

Sellers further represent and warrant to the Buyer, to the best of Sellers' knowledge, that:

(i)     There are not present in, on or under the Real Property any Hazardous Substances.

(ii)     The Real Property is not being used and has not in the past been used for the handling, storage, transportation, manufacture, release or disposal of any Hazardous Substances.

(iii)     Except with respect to the discharge of wastewater, which is subject to a consent order with the Town of Cazenovia, NY, there are no present and no past claims, investigations, administration proceedings, litigation, regulatory hearings or requests or demands for remedial or response actions or for compensation, which may be proposed, threatened or pending with respect to the Real Property, alleging noncompliance with or violation of any Environmental Law, seeking relief under any Environmental Law or relating to any required environmental permits, licenses or authorizations.

(iv)     All reports and notices required by any Environmental Law have been duly made with respect to the Real Property, and all permits, licenses and

67143442.8

authorizations required by any Environmental Law have been obtained and are in full force and effect with respect to the Real Property.

(v)    There are not now present, nor have there ever been present, in, on or under the Real Property any above-ground or underground storage tanks used for the storage of petroleum, petroleum by-products or any other Hazardous Substances.

(vi)    The Real Property is not and never has been listed on the United States Environmental Protection Agency's National Priorities List of Hazardous Waste Sites or on any other list, schedule, log, inventory or record of hazardous waste sites maintained by any federal, state, or local agency.

(vii)    The Sellers have disclosed and delivered to the Buyer all environmental reports and investigations which the Sellers have obtained, ordered or come into possession of with respect to the Real Property.

**SECTION 3.04    GENERAL    REPRESENTATIONS,    WARRANTIES AND UNDERTAKINGS OF BUYER.**    In addition to the specific representations and warranties by Buyer set forth elsewhere in this Agreement, Buyer makes the following general representations and warranties to Sellers with the intention that Sellers may rely on the same:

(a)    **Organization and Standing.**    Buyer is a limited liability company duly organized and validly existing in good standing under the laws of the State of New York and has the power to enter into and perform this Agreement.

(b)    **Corporate Authority of Buyer.**    Buyer has taken all corporate action required to authorize the execution and delivery of this Agreement, and has the power to perform its obligations under this Agreement. Prior to the Closing Date, Buyer shall have taken all corporate action required in order to enable it to consummate the transactions contemplated by this Agreement and to make binding upon it the representations, warranties and covenants made or to be performed by it under this Agreement.

(c)    **No Default.**    Neither the execution of this Agreement by Buyer nor the consummation of the transactions contemplated by this Agreement by Buyer constitute a violation of, or are or will be in conflict with, or are or will constitute a default under, any term or provision of any contract, indenture, or other agreement or instrument to which Buyer is a party.

67143442.8

11

## ARTICLE IV
## CLOSING

**SECTION 4.01**     **CLOSING.**  Subject to the satisfaction or waiver of the conditions precedent set forth in Section 4.03 of this Agreement, the consummation of the purchase and sale of the Assets (the "Closing") shall be held as soon as practical following issuance of the Approved Order, or such other date as may be agreed upon by the parties (the "Closing Date").  The Closing shall take place at such place and time as are mutually agreed upon between the parties.  At the Closing the following documents and considerations shall be exchanged between the parties:.

(a)     **Deliveries by Sellers at the Closing.**  At the Closing, Sellers shall deliver to Buyer the following documents and considerations against the simultaneous delivery by Buyer to Sellers of the documents and considerations described in Section 4.01(b) below:

(i)     **General Assignment and Bill of Sale** in the form of Exhibit 4.01(a)(i) attached hereto transferring, assigning and conveying the Assets to Buyer.

(ii)     **Assumption and Assignment Agreement** in form and substance acceptable to Buyer with respect to the Assumed Contracts.

(iii)     **Warranty Deed** for all Real Property to be conveyed to Buyer, together with forms TP-582 and RP-5217.

(iv)     **Closing Certificate** from Sellers executed by a duly authorized officer certifying as to the matters set forth in Section 4.03(b).

(v)     **Title Affidavit** in the form customarily requested by national title insurance companies.

(vi)     **FIRPTA Certificate** pursuant to the Foreign Investment and Real Property Transfer Act.

(vii)     **Other Documents** as may be required to consummate the transactions contemplated by this Agreement, including a transition services agreement and   if requested by Buyer, an assignment of the corporate name "Empire Farmstead Brewery, Inc." and evidence that Empire Farmstead Brewery, Inc. has changed its name to permit such assignment.

(b)     **Deliveries by Buyer at Closing.**  At the Closing, Buyer shall deliver to Sellers the following documents and considerations against simultaneous delivery of documents and considerations by Sellers as set forth in Section 4.01(a) above:

(i)     **Cash Payments** as provided in Section 1.03(a) of this Agreement.

67143442.8

12

(ii)    **Other Documents** as may be required to consummate the transactions contemplated by this Agreement.

SECTION 4.02    **DELIVERY OF ASSETS; RISK OF LOSS**. Delivery of possession of the Assets purchased hereunder shall be deemed to have occurred for all purposes at 11:59 p.m. on the Closing Date, and all risks of loss, whether or not covered by insurance, shall be on Sellers until such time and on Buyer from and after such time. The delivery or possession of the property to be transferred hereunder shall be so arranged between Buyer and Sellers as to permit Buyer to take over the operation of the Business without interruption.

SECTION 4.03    **CLOSING CONDITIONS**.

(a)    **Court Approval Required**. Buyer and Sellers acknowledge and agree that the Bankruptcy Court's entry of the Approval Order in form and substance acceptable to Buyer shall be required in order to consummate the purchase and sale of Assets, and that the requirement that the Approval Order be entered is a condition that cannot be waived by any party.

(b)    **Conditions to Obligations of Buyer**. The obligation of Buyer to consummate the purchase and sale of Assets is subject to the satisfaction, at or before the Closing, of each of the following conditions, any of which conditions may, except for the condition set forth in Section 4.03(a), be waived by Buyer in its sole discretion:

(i)    **Representations and Warranties**. The representations and warranties of Sellers set forth in this Agreement shall be true and correct in all material respects on and as of the Closing Date as though made on and as of the Closing Date (except for representations and warranties made as of a specified date, which shall be true and correct only as of the specified date).

(ii)    **Agreements and Covenants**. Sellers shall have performed and complied with each agreement, covenant and obligation required to be performed or complied with by them under this Agreement at or before the Closing in all material respects.

(iii)    **No Material Adverse Effect**. There shall not have occurred any event, fact or circumstance that has had, or is reasonably likely to have, a Material Adverse Effect. For purposes of this Agreement, "Material Adverse Effect" shall mean any effect, event, occurrence, development, state of facts, condition or change, that has had, or could reasonably be expected to have, individually and/or in the aggregate, a material adverse effect on (a) the Business or the Liabilities, prospects, financial condition or assets of Sellers or the Assets, (b) the condition or value of any material portion of the Assets, (c) the ability of Sellers to timely perform their obligations under this Agreement, or (d) the ability of Sellers to timely consummate the transactions contemplated hereby.

(iv)    **Final Approval Order; No Injunction or Litigation**. The Approval Order shall have become a final nonappealable order. On the Closing Date (a) there shall be no Order staying, reversing, modifying, vacating or

13

amending the Approval Order, (b) there shall be no preliminary or permanent injunction or other Order of any court or Government declaring this Agreement invalid or unenforceable in any material respect or otherwise preventing the transactions contemplated herein from being consummated, and (c) there shall not be pending or threatened any suit, action or proceeding challenging or seeking to restrain, prohibit, alter or materially delay the consummation of any of the transactions contemplated by this Agreement.

(v)    **Title.**  Buyer's title insurer shall be prepared to issue a policy of owner's title insurance insuring Buyer and covering the Real Property, in form and content acceptable to Buyer in Buyer's sole discretion.

(vi)    **Lien Releases.**  All liens, claims and encumbrances related to the Assets shall have been released in full, and Sellers shall have delivered to Buyer written evidence of the same in form satisfactory to Buyer (the "Lien Releases").

## ARTICLE V
## TERMINATION

**SECTION 5.01    TERMINATION.**  This Agreement may be terminated and the transactions contemplated herein abandoned at any time prior to the Closing Date by notice given by one party to the other party in the manner hereinafter provided upon the happening of the following events:

(a)    **Misrepresentation; Nonfulfillment of Conditions.**  If any party has made any misrepresentation of a material fact to the other parties and such misrepresentation is not cured within 10 days after notice thereof or if the conditions precedent to the Closing to be performed by a party shall not have been fulfilled by such party on or before the Closing Date (unless waived by the other parties, provided however, that the right to terminate this Agreement pursuant to this clause shall not be available to any party whose breach of any of its representations, warranties, covenants or agreements contained herein results in such failure to approve); or

(b)    **Default.**  If any party fails to observe or perform in a timely manner any of the covenants and agreements herein contained and fails to cure the same within a period of 10 days after notice thereof; or

(c)    **Action by Government or Other Person.**  If any actual investigation, action or proceeding shall have been commenced against any party which has as a purpose to restrain or prohibit the transactions contemplated by this Agreement, or which places in question the rights of Sellers to sell, transfer, assign or otherwise convey the Assets; or

(d)    **Bidding Procedures.**  If the Bidding Procedures Order is not entered on or before September 20, 2019 or if it is entered in a form that is materially different from, or contains any provision materially inconsistent with, the bidding procedures set forth on

67143442.8

14

Exhibit 2.03, including a reduction in the Break-Up Fee, Buyer may terminate this Agreement; or

(e) **No Approval of Agreement**. If the Bankruptcy Court rules that it does not approve this Agreement for any reason, *provided, however,* that the right to terminate this Agreement pursuant to this clause shall not be available to any party whose breach of any of its representations, warranties, covenants or agreements contained herein results in such failure to approve; or

(f) **Outside Date**. If the Closing shall not have occurred by the close of business on October 31, 2019; *provided* that the right to terminate this Agreement pursuant to this clause shall not be available to any party whose breach of any of its representations, warranties, covenants or agreements contained herein results in the failure of the Closing to be consummated by such time; or

(g) **Environmental Assessment**. If the results of an environmental assessment of the Real Property prepaid by Buyer reveals facts or circumstances that could affect the value of such property in a material way, Buyer may terminate this Agreement; or

(h) **Approval Order**. If the Approval Order contains materially different provisions from the provisions set forth in Section 2.05 herein, including the absence of a finding that Buyer is a "good faith purchaser" under Section 363(m) of the Bankruptcy Code; or

(i) **Vacated Order**. If the Approval Order is vacated; or

(j) **Consent**. Mutual written consent of the parties hereto.

The options to terminate this Agreement as set forth in Subparagraphs (a), (b) and (c) above shall be deemed to be an additional right of the party having the power to exercise the option and shall not relieve the other party from the obligation to perform the provisions of this Agreement or preclude an action for specific performance of the provisions of this Agreement by the party having the power to exercise the option.

## ARTICLE VI
## MISCELLANEOUS

**SECTION 6.01    ENTIRE AGREEMENT**. This Agreement and the exhibits attached hereto embody the entire understanding between the parties hereto and shall supersede all prior agreements and understandings, both written and oral, between the parties hereto with respect to the subject matter hereof, and neither party shall be liable or bound to the other in any manner by any warranties or representations not set forth herein or contemplated hereby.

**SECTION 6.02    SUCCESSORS AND ASSIGNS**. The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and permitted assigns of the parties hereto. This Agreement may not be assigned by

67143442.8

15

any party without the prior written consent of the other party; provided, that, Buyer may assign this Agreement to one or more affiliates of Buyer, and that no consent to such assignment is needed, provided, however, that such assignment shall not relieve Buyer nor its guarantor of their obligations under this Agreement.

SECTION 6.03    **COUNTERPARTS**.  This Agreement may be executed in one or more counterparts, each of which shall for all purposes be deemed to be an original and all of which shall constitute one and the same instrument.

SECTION 6.04    **NOTICES**.  All notices, requests, and demands provided for in this Agreement shall be delivered in person, or by facsimile transmission or deposited in the United States mail, postage prepaid, addressed as follows:

    (a)    <u>If to Sellers</u>:

        EMPIRE FARMSTEAD BREWERY, INC.
        EMPIRE PROPERTIES, LLC
        33 Rippleton Road
        Cazenovia, NY 13035
        Attention:  David Katleski

        <u>With a copy to</u>:
        Lee Woodard
        Harris Beach, PLLC
        333 West Washington Street
        Suite 200
        Syracuse, NY 13202

    (b)    <u>If to Buyer</u>:

        Rocale, LLC
        c/o Feldmeier Equipment, Inc.
        6800 Townline Road
        Syracuse, New York 13211
        Attn:  Colby Clark

        <u>With a copy to</u>:

        Jeffrey A. Dove
        Barlcay Damon, LLP
        Barclay Damon Tower
        125 E. Jefferson Street
        Syracuse, New York 13202

or to such other address as such party shall designate by written notice to the other party hereto. All such notices, requests and demands shall be effective when actually delivered, when legibly received in the case of a facsimile transmission or on the third business day after deposited in the mail.

67143442.8

16

SECTION 6.05    HEADINGS. The headings of the articles and sections in this Agreement are inserted for convenience only and shall not be deemed to constitute a part of this Agreement or to affect the interpretation of the provisions hereof.

SECTION 6.06    MODIFICATION AND WAIVER. Any of the terms or conditions of this Agreement may be waived in writing at any time by the party which is entitled to the benefit thereof, and this Agreement may be modified or amended at any time by written instrument signed by Sellers and Buyer. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar), nor shall any such waiver constitute a continuing waiver.

SECTION 6.07    EXHIBITS. All exhibits attached hereto are expressly made a part of this Agreement as fully as though completely set forth herein, and all references to this Agreement herein or in any such exhibits shall be deemed to refer to and include all such exhibits. All statements contained in any exhibit are an integral part of this Agreement, and shall be deemed to be representations and warranties of the party which delivered such statement.

SECTION 6.08    ADDITIONAL INSTRUMENTS AND FURTHER ASSURANCES. The Sellers agree that they will, upon request of Buyer, execute and deliver to Buyer from time to time after the Closing Date such other instruments of sale, transfer, assignment and conveyance and take such other actions as Buyer may reasonably request to effect ownership in Buyer and to put Buyer in possession of all or any of the Assets.

SECTION 6.09    SURVIVAL. The parties hereto agree that all representations, warranties and agreements contained in or made pursuant to this Agreement, survive the Closing.

SECTION 6.10    GOVERNING LAW. The parties hereby agree that this Agreement shall be construed, enforced and governed by the laws of the State of New York.

SECTION 6.11    SEVERABILITY. If any term or provision of this Agreement shall be determined to any extent to be invalid or unenforceable, the remainder of this Agreement shall not be affected thereby, and each term and provision of the Agreement shall be valid and enforced to the fullest extent permitted by law. Upon the determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties shall negotiate in good faith to modify this Agreement so as to affect their original intent as closely as possible.

SECTION 6.12    SPECIFIC PERFORMANCE. The parties hereto recognize that any breach of the terms of this Agreement may give rise to irreparable harm for which money damages would not be adequate remedy, and accordingly agree that, in addition to other remedies, the non-breaching party or parties will be entitled to enforce the terms of this Agreement by a decree of specific performance without the necessity of proving the inadequacy of a remedy of money damages.

SECTION 6.13    BANKRUPTCY PROCESS. Unless Buyer is in material breach of this Agreement or this Agreement has been terminated, Sellers covenant and agree that if the Approval Order is entered, the terms of any plan submitted by Sellers to the Bankruptcy

67143442.8

17

Court for confirmation or otherwise supported by Sellers shall not conflict with, supersede, abrogate, nullify, modify or restrict the terms of this Agreement or the rights of

67143442.8

Buyer hereunder, or in any way prevent or interfere with the consummation or performance of the transactions contemplated by this Agreement, including any transaction that is contemplated by or approved pursuant to the Approval Order.

SECTION 6.14    **NOTICE TO CREDITORS.** Notice of the hearing on the request for entry of the Approval Order and the objection deadline shall be served by Sellers in accordance with the Bankruptcy Code and Bankruptcy Rules, including Bankruptcy Rules 2002, 6004, 6006 and 9014, any applicable local rules of the Bankruptcy Court and any orders of the Bankruptcy Court on all persons required to receive notice, including, but not limited to (i) the Office of the United States Trustee for the Northern District of New York; (ii) counsel to any Creditor's Committee; (iii) all entities known to have expressed an interest in a transaction with respect to the Assets during the past year; (iv) all counterparties to any contracts or leases, whether executory or not; (v) all parties with liens, claims or encumbrances on or against any of the Sellers' assets; (vi) all affected federal, state and local governmental regulatory and taxing authorities, including the Internal Revenue Service; (vii) all known holders of claims against and equity interests in the Sellers, (viii) all of the Sellers' insurers; (ix) all parties that have filed and not withdrawn requests for notices pursuant to Bankruptcy Rule 2002 (the "2002 List") and (x) to the extent not already included above, all parties in interest listed on the Sellers' creditor matrix (collectively, the "Notice Parties"). Sellers shall provide notice to the Notice Parties that all responses or objections to the Sale Motion shall be served on, among others, counsel to Buyer.

67143442.8

19

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed by their duly authorized officers as of the date and year first above written.

**ROCALE, LLC**

By_____
Its_____

**FELDMEIER EQUIPMENT, INC.,** solely as guarantor of the performance of this Agreement by Rocale, LLC

By_____
Its_____

**EMPIRE FARMSTEAD BREWERY, INC.**

By_____
Its_____

**EMPIRE BREWING PROPERTIES, LLC**

By_____
Its_____

67143442.8

# EXHIBIT 1.01(a)

## PERSONAL PROPERTY

1.    Crops growing or harvested
2.    Buildings
3.    Equipment
4.    Furniture and fixtures
5.    Kitchen equipment
6.    Miscellaneous equipment and office equipment
7.    Patio

## EXHIBIT 1.01(b)

## REAL PROPERTY

See Attached Description and Survey

**EXHIBIT 1.01(c)**

**INVENTORY**

1.  Restaurant food and beverage
2.  Restaurant supplies
3.  Brewery ingredients
4.  Brewery work in process
5.  Brewery finished goods
6.  Brewery chemicals, supplies and packaging

## EXHIBIT 1.01(f)

## ASSIGNED CONTRACTS

Buyer shall have the option to assume the purchase contract on the Ford F250 pickup.

**EXHIBIT 1.02**

**EXCLUDED ASSETS**

FACILITIES:
20' EXTENSION LADDER

BREWERY:
AMERICAN FLAG
PING-PONG TABLE
(11) AWARD BANNERS

TASTING ROOM:
BEER CAN CHALK BOARD
(4) LIVE EDGE WOODEN TABLES
TOBY MUG COLLECTION
GROWLER LAMP
MISC ART AND MEMORABILIA
RCA DOG
(2) TV'S
(1) BARN TABLE – IN FOYER

CELLAR:
(1) TV
(14) PLASTIC RADIOS
 (8) BEER HALL TABLES & (16) BENCHES
ELVIS LAMP
STERIO & SPEAKERS
RECORDS & CD'S
 (3) DEB WESTER PAINTINGS

OFFICE:
(2) COPIERS
PAPER SHREDDER
(6) APPLE DESK TOP COMPUTERS
MISC ART & MEMORABILIA

**EXHIBIT 2.03**

**BIDDING PROCEDURES ORDER**

See Attached Bidding Procedures

## EXHIBIT 4.01(a)(i)

## GENERAL ASSIGNMENT AND BILL OF SALE

IN CONSIDERATION of the sum of One Dollar ($1.00) and other good and valuable consideration given by ROCALE, LLC (hereinafter "Buyer") as transferee, to the undersigned EMPIRE PROPERTIES, LLC, and EMPIRE FARMSTEAD BREWERY, INC. (hereinafter "Sellers"), as transferor, the receipt and sufficiency of which is hereby acknowledged by Sellers, the undersigned, Sellers, hereby assign, transfer and convey to Buyer the following assets (hereinafter the "Assets") owned by Sellers pursuant to the terms of that Agreement for Purchase and Sale of Assets dated as of July 2, 2019 between Sellers and Buyer (the "Asset Purchase Agreement"):

(a)     Personal Property.   All tangible property of the Business other than Excluded Assets, which is described by category on Schedule I attached hereto and incorporated herein (the "Personal Property");

(b)     Inventory.   All inventory on hand and associated with the Business as of the close of business as of the Closing Date, as described by category on Schedule II, attached hereto and incorporated herein (the "Inventory");

(c)     Business Records.   All business records and books associated with the Assets or the operation of the Business (the "Business Records").

(d)     Permits.   To the extent legally transferable, the Permits set forth on Schedule 1.01(e). Buyer shall pay any fees and costs required to transfer such Permits;

(e)     Contracts.   The Contracts set forth on Schedule III, which contracts are to be assumed and assigned to Buyer at the Closing (collectively, the "Assigned Contracts");

(f)     PILOT.   The Payment in Lieu of Tax Agreement dated June 1, 2015 (the "PILOT") between Madison County Industrial Development Agency and Brewery, to the extent the PILOT is assignable to Buyer; and

(g)     Other.   All other assets (including intangible assets including the right to the corporate name "Empire Farmstead Brewery, Inc.") of Seller relating to the Business and not specifically included in the definition of Excluded Assets.

Capitalized terms not otherwise defined herein shall have the meaning given them in the Asset Purchase Agreement.

IN WITNESS WHEREOF, Sellers have caused this General Assignment and Bill of Sale to be executed effective this _____ day of _____, 2019.

**EMPIRE PROPERTIES, LLC**              **EMPIRE FARMSTEAD BREWERY, INC.**

By_____             By_____
  Its_____             Its_____

67143442.8

## Schedule I

## PERSONAL PROPERTY

1.    Crops growing or harvested
2.    Buildings
3.    Equipment
4.    Furniture and fixtures
5.    Kitchen equipment
6.    Miscellaneous equipment and office equipment
7.    Patio

**Schedule II**

**INVENTORY**

1.    Restaurant food and beverage
2.    Restaurant supplies
3.    Brewery ingredients
4.    Brewery work in process
5.    Brewery finished goods
6.    Brewery chemicals, supplies and packaging

# Schedule III

## ASSIGNED CONTRACTS